IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| and ) | |
| ) | |
| THE STATE OF INDIANA, ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | Civil Action No. 2:11-cv-00016 |
| ) | |
| NORTHERN INDIANA PUBLIC ) | |
| SERVICE CO., ) | |
| ) | |
| Defendant. ) | |

**<u>CONSENT DECREE</u>**

## TABLE OF CONTENTS

I.      Jurisdiction and Venue ...................................................................................3

II.     Applicability .................................................................................................4

III.    Definitions....................................................................................................5

IV.     NO$_X$ Emission Reductions and Controls ......................................................16

      A.      NO$_X$ Emission Controls ....................................................................16
      B.      General NO$_x$ Provisions....................................................................19
      C.      Annual System Tonnage Limitation for NOx........................................19
      D.      Use and Surrender of NO$_x$ Allowances ...............................................21

V.      SO$_2$ Emission Reductions and Controls........................................................25

      A.      SO$_2$ Emission Controls .....................................................................25
      B.      General SO$_2$ Provisions ....................................................................29
      C.      Annual System Tonnage Limitation for SO$_2$ .......................................29
      D.      Use and Surrender of SO$_2$ Allowances ...............................................30

VI.     PM Emission Reductions and Controls ........................................................33

      A.      Optimization of PM Emission Controls................................................33
      B.      PM Emissions ...................................................................................35
      C.      PM Emissions Testing .......................................................................35
      D.      General PM Provision........................................................................36

VII.    Unit Retirement...........................................................................................36

VIII.   Prohibition on Netting Credits or Offsets from Required Controls....................37

IX.     PM and Mercury Continuous Emissions Monitoring Systems (CEMS) .........................38

X.      Environmental Mitigation Projects ...............................................................41

XI.     Civil Penalty...............................................................................................43

XII.    Resolution of Past and Future Claims...........................................................45

      A.      Resolution of Plaintiffs' Civil Claims..................................................45
      B.      Pursuit of Plaintiffs' Civil Claims Otherwise Resolved ........................47

i

XIII.    Periodic Reporting ................................................................................50

XIV.    Review and Approval of Submittals .....................................................53

XV.     Stipulated Penalties .............................................................................53

XVI.    Force Majeure ......................................................................................61

XVII.   Affirmative Defenses ...........................................................................65

XVIII. Dispute Resolution ...............................................................................69

XIX.    Permits and SIP Revisions ...................................................................71

XX.     Information Collection and Retention ...................................................74

XXI.    Notices .................................................................................................75

XXII.   Sales or Transfers of Ownership Interests ...........................................77

XXIII. Effective Date ......................................................................................79

XXIV. Retention of Jurisdiction .......................................................................79

XXV.   Modification.........................................................................................80

XXVI. General Provisions             ...............................................................80

XXVII. Signatories and Service ......................................................................84

XXVIII. Public Comment..................................................................................84

XXIX. Conditional Termination of Enforcement Under Decree.........................85

XXX. Final Judgment ......................................................................................86

Appendix A:   Environmental Mitigation Projects

WHEREAS, Plaintiff, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiff, the State of Indiana, are filing with this Consent Decree a Complaint for injunctive relief and civil penalties pursuant to Sections 113(b)(2) and 167 of the Clean Air Act ("the Act"), 42 U.S.C. §§ 7413(b)(2) and 7477, and 326 Indiana Administrative Code sections 2-2 and 2-7, alleging that Defendant, Northern Indiana Public Service Co. ("NIPSCO"), has undertaken construction projects at major emitting facilities in violation of the Prevention of Significant Deterioration ("PSD") provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, in violation of Nonattainment New Source Review requirements, 42 U.S.C.§§ 7501-7515,  in violation of the requirements of Title V of the Act, 42 U.S.C. §§ 7661-7661f and in violation of the federally enforceable Indiana State Implementation Plan ("SIP");

WHEREAS, EPA issued a Notice of Violation (the "NOV") to NIPSCO on September 29, 2004, pursuant to Section 113(a) of the Act, 42 U.S.C. § 7413(a), alleging violations at the Michigan City, Rollin M. Schahfer, and Bailly Generating Stations of:

(a)    the PSD provisions in Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-92,

(b)    the Nonattainment New Source Review requirements in Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515,

(c)    Subchapter V of the Act, 42 U.S.C. §§ 7661-7661f, and

(d)    the federally enforceable Indiana SIP, including provisions implementing 40 C.F.R. § 52.21, and approved by EPA;

WHEREAS, EPA provided NIPSCO and the State of Indiana actual notice of the alleged violations and commencement of the action, in accordance with Section 113 of the Act, 42 U.S.C. § 7413;

- 1 -

WHEREAS, NIPSCO has been the owner and operator of the Michigan City, Rollin M. Schahfer, and Bailly Generating Stations from 1985 to the present;

WHEREAS, in the Complaint, Plaintiffs United States and the State of Indiana (collectively "Plaintiffs") allege, inter alia, that NIPSCO modified units and failed to obtain the necessary permits and install the controls necessary under the Act to reduce sulfur dioxide, nitrogen oxides, and/or particulate matter emissions, and that such emissions can damage human health and the environment;

WHEREAS, Plaintiffs' Complaint states claims upon which, if proven, relief can be granted against NIPSCO under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477, and 28 U.S.C. § 1355;

WHEREAS, NIPSCO has denied and continues to deny the violations alleged in the Complaint and the NOV, and maintains that it has been and remains in compliance with the Act, federal implementing regulations and Indiana air regulations and statutes, including the Indiana SIP, and that it is not liable for civil penalties, injunctive or other relief;

WHEREAS, the Plaintiffs and the Defendant (collectively "the Parties," and each, individually, a Party) anticipate that the installation and operation of pollution control equipment pursuant to this Consent Decree will achieve significant reductions of sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_x$"), and particulate matter ("PM") emissions and improve air quality; and

WHEREAS, the Parties have agreed, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arms' length; that this settlement is fair, reasonable, in the best interest of the Parties and the public, and is consistent with the goals of the Act and the Indiana SIP; and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter;

- 2 -

WHEREAS, the Defendant has asserted that its Bailly Generating Station Units 7 and 8, Michigan City Generating Station Unit 12, and Schahfer Generating Station Unit 14, are cyclone-fired units, with cycling demand for electric generation and inherently high NOx baseline emissions, equipped with SCR (as hereinafter defined) systems with ammonia on demand ("AOD") systems.

NOW, THEREFORE, without any admission by the Defendant, and without adjudication of or admission with respect to the violations alleged in the Complaint or the NOV, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.    **JURISDICTION AND VENUE**

1)    This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. §§ 1391(b) and (c).

2)    Solely for the purposes of this Consent Decree and the underlying Complaint, Defendant waives all objections and defenses that it may have to the Court's jurisdiction over Defendant and to venue in this District.  Defendant shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree and agrees that the Complaint states claims upon which, if such claims were proven, relief may be granted pursuant to Section 113 of the Act, 42 U.S.C. § 7413(b).

3)    Solely for purposes of the Complaint filed by Plaintiffs in this matter and this Consent Decree, for purposes of entry and enforcement of this Consent Decree, Defendant waives any defense or objection based on standing.  Except as expressly provided for herein, this Consent Decree shall not create any rights in any party other than

- 3 -

Plaintiffs and Defendant.  Except as provided in Section XXVIII (Public Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

4)        Notwithstanding the foregoing, should this Consent Decree not be entered by this Court, then the waivers and consents set forth in this Section I (Jurisdiction and Venue) shall be null and void and of no effect.

## II.    APPLICABILITY

5)        Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the Plaintiffs, the United States, including EPA, and the State of Indiana, including the Indiana Department of Environmental Management, and upon NIPSCO, its successors and assigns, and its officers, employees and agents, solely in their capacities as such.

6)        NIPSCO shall be responsible for providing a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other companies or organizations retained after entry of this Consent Decree to perform any of the work required by this Consent Decree.  Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, NIPSCO shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree.  In any action to enforce this Consent Decree, NIPSCO shall not assert as a defense the failure of its officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless NIPSCO establishes that such failure resulted from a Force Majeure Event, as defined in Section XVI (Force Majeure) of this Consent Decree.

- 4 -

III.   **DEFINITIONS**

7)   A "365-Day Rolling Average Emission Rate" for a Cyclone-fired Unit,

other than the Bailly Units, shall be expressed as lb/mmBTU and calculated in

accordance with the following procedure:  first, sum the total pounds of NOx emitted

from the Cyclone-fired Unit during an Operating Day and the previous three hundred and

sixty-four (364) Operating Days, with such emissions being determined from data

derived from CEMS installed and operated at the Unit; second, sum the total heat input to

the Cyclone-fired Unit in mmBTU during the Operating Day and the previous three

hundred and sixty-four (364) Operating Days; and third, divide the total number of

pounds of NOx emitted during those three hundred and sixty-five (365) Operating Days

by the total heat input during those three hundred and sixty-five (365) Operating Days.

For Bailly Units 7 and 8, which share common stacks, the "365-Day Rolling Average

Emission Rate" shall be expressed as lb/mmBTU and calculated in accordance with the

procedure enumerated above in this Paragraph for other Cyclone-fired Units, except that

the total pounds of NOx emitted and the total heat input used to calculate the 365-Day

Rolling Average Emission Rate shall be calculated by using the combined total pounds of

NOx emitted from Bailly Units 7 and 8 and the combined total heat input to Bailly Units

7 and 8.  A new 365-Day Rolling Average Emission Rate shall be calculated for each

new Operating Day.   When a 365-Day Rolling Average Emission Rate includes

Operating Days to which two different 365-Day Rolling Average Emission Rates apply,

the less stringent 365-Day Rolling Average Emission Rate shall apply until such time as

all Operating Days within the 365-day rolling average period fall within the more

stringent specified 365-Day Rolling Average Emission Rate (e.g., if the specified 365-

- 5 -

Day Rolling Average Emission Rate for a Cyclone-fired Unit on December 31, 2009 is 0.140 lb/mmBTU and the specified 365-Day Rolling Average Emission Rate for that same Cyclone-fired Unit on December 31, 2010 becomes 0.120 lb/mmBTU, the less stringent December 31, 2009 specified rate would be the applicable 365-Day Rolling Average Emission Rate to determine on June 1, 2011 the Cyclone-fired Unit's compliance because the 365-Day Rolling Average Emission Rate determined on June 1, 2011 would include Operating Days prior to December 31, 2010).  Each 365-Day Rolling Average Emission Rate shall include all emissions that occur during all periods of startup, shutdown and Malfunction within an Operating Day, except that emissions associated with a Malfunction that is determined to be a Force Majeure Event pursuant to Section XVI of this Consent Decree shall be excluded from the calculation of a 365-Day Rolling Average Emission Rate.

8)      A "30-Day Rolling Average Emission Rate" for a Unit, other than the Bailly Units, shall be expressed as lb/mmBTU and calculated in accordance with the following procedure:  first, sum the total pounds of the pollutant in question emitted from the Unit during an Operating Day and the previous twenty-nine (29) Operating Days, with such emissions being determined from data derived from CEMS installed and operated at the Unit; second, sum the total heat input to the Unit in mmBTU during the Operating Day and the previous twenty-nine (29) Operating Days; and third, divide the total number of pounds of the pollutant emitted during the thirty (30) Operating Days by the total heat input during the thirty (30) Operating Days.  For Bailly Units 7 and 8, which share common stacks, the "30-Day Rolling Average Emission Rate" shall be expressed as lb/mmBTU and calculated in accordance with the procedure enumerated

- 6 -

above in this Paragraph for other Units, except that the total pounds of NOx emitted and the total heat input used to calculate the 30-Day Rolling Average Emission Rate shall be calculated by using the combined total pounds of NOx emitted from Bailly Units 7 and 8 and the combined total heat input to Bailly Units 7 and 8.  A new 30-Day Rolling Average Emission Rate shall be calculated for each new Operating Day.  When a 30-Day Rolling Average Emission Rate includes Operating Days that fall within two different specified 30-Day Rolling Average Emission Rates, the less stringent 30-Day Rolling Average Emission Rate shall apply until such time as all Operating Days within the 30-day rolling average period fall within the more stringent specified 30-Day Rolling Average Emission Rate (e.g., if the specified 30-Day Rolling Average Emission Rate for a Unit on December 1, 2010 is 0.170 lb/mmBTU and the specified 30-Day Rolling Average Emission Rate for that same Unit on January 1, 2011 becomes 0.150 lb/mmBTU, the less stringent December 1, 2010 specified rate would be the applicable 30-Day Rolling Average Emission Rate to determine on January 15, 2011 the Unit's compliance because the 30-Day Rolling Average Emission Rate determined on January 15, 2011 would include Operating Days prior to January 1, 2011).  Each 30-Day Rolling Average Emission Rate shall include all emissions that occur during all periods of startup, shutdown and Malfunction within an Operating Day, except that emissions associated with a Malfunction that is determined to be a Force Majeure Event pursuant to Section XVI of this Consent Decree shall be excluded from the calculation of a 30-Day Rolling Average Emission Rate.

9)     A "30-Day Rolling Average Removal Efficiency" means the percent reduction in the emissions of a pollutant achieved by a Unit's pollution control device

over a 30-Operating Day period.  This percentage shall be calculated by subtracting the Unit's outlet 30-Day Rolling Average Emission Rate from the Unit's inlet 30-Day Rolling Average Emission Rate, with such rates being determined from data derived from CEMS installed and operated at the Unit, dividing the result by the 30-Day Rolling Average Emission Rate from the Unit's inlet and then multiplying that result by 100.  A new 30-Day Rolling Average Removal Efficiency shall be calculated for each new Operating Day.  30-Day Rolling Average Emission Rates used in the calculation of 30-Day Rolling Average Removal Efficiencies pursuant to this Paragraph shall include all emissions that occur during all periods of startup, shutdown and Malfunction within an Operating Day, except that emissions associated with a Malfunction that is determined to be a Force Majeure Event pursuant to Section XVI of this Consent Decree shall be excluded from the calculation of a 30-Day Rolling Average Emission Rate.

10)     "Annual System Tonnage Limitation" means the limitation on the number of tons of the pollutant in question that may be emitted from the NIPSCO System during the relevant calendar year (i.e., January 1 through December 31), and shall include all emissions of the pollutant emitted during periods of startup, shutdown and Malfunction.

11)     "Boiler Island" means a Unit's:  (a) fuel combustion system (including bunker, coal pulverizers, crusher, stoker, and fuel burners); (b) combustion air system; (c) steam generating system (i.e., firebox, boiler tubes and walls); and (d) draft system (excluding the stack), as further described in "Interpretation of Reconstruction," John B. Rasnick, U.S. EPA (November 25, 1986), and the attachments thereto.

12)     "Calendar Month" means all of the Operating Days in one calendar month period.

- 8 -

13)     "Capital Expenditures" means all capital expenditures, as defined by Generally Accepted Accounting Principles ("GAAP"), as those principles exist at the Date of Entry of this Consent Decree, excluding the cost of installing or upgrading pollution control devices.

14)     "CEMS" and "Continuous Emission Monitoring System" mean, for obligations involving $NO_X$ and $SO_2$ under this Consent Decree, the devices defined in 40 C.F.R.§ 72.2 and installed and maintained as required by 40 C.F.R. Part 75.

15)     "Clean Air Act" and "the Act" mean the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

16)     "Consent Decree" and "Decree" mean this Consent Decree, including Appendix A which is hereto incorporated into this Consent Decree.

17)     "Continuous Operation" and "Continuously Operate" mean, for obligations involving NOx, PM, and $SO_2$ under this Consent Decree, the operation of any specified NOx, PM or $SO_2$ control technology equipment at all times that the Unit it serves is in operation, except during a Malfunction of the control technology equipment, consistent with technological limitations, manufacturers' specifications, and good air pollution control practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)).

18)     "Cyclone-fired Unit" means  those Units in the NIPSCO System that operate cyclone-fired boilers for electric generation and have inherently high NOx baseline emissions.  The following Units in the NIPSCO System are considered Cyclone-fired Units: Bailly Unit 7 and Unit 8, Michigan City Unit 12, and Schahfer Unit 14.

19)      "Date of Entry" means the date this Consent Decree is signed or otherwise approved in writing by the District Court Judge for the United States District Court for the Northern District of Indiana.

20)      "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Northern District of Indiana.

21)      "Defendant" means the Northern Indiana Public Service Co. ("NIPSCO").

22)      "Emission Rate" means the number of pounds of pollutant emitted per million British thermal units of heat input ("lb/mmBTU"), measured in accordance with this Consent Decree.

23)      "EPA" means the United States Environmental Protection Agency.

24)      "ESP" and "Electrostatic Precipitator" mean a device for removing particulate matter from combustion gases by imparting an electric charge to the particles and then attracting them to a metal plate or screen of opposite charge before the combustion gases are exhausted to the atmosphere.

25)      "Flue Gas Desulfurization System" and "FGD" mean a pollution control device that employs flue gas desulfurization technology, including an absorber utilizing lime, fly ash, or limestone slurry, for the reduction of sulfur dioxide emissions.

26)      "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum oil, and natural gas.

27)      "Improved Unit" means, in the case of $NO_X$, a NIPSCO System Unit that has an SCR or is scheduled under this Consent Decree to be equipped with an SCR (or an equivalent NOx control technology approved pursuant to Paragraph 65) or in the case of

- 10 -

SO$_2$, a NIPSCO System Unit that has an FGD or is scheduled under this Consent Decree to be equipped with an FGD (or equivalent SO$_2$ control technology approved pursuant to Paragraph 80) in accordance with this Consent Decree. A Unit may be an Improved Unit for one pollutant without being an Improved Unit for the other. The following Units are, in accordance with the preceding sentences, Improved Units for purposes of this Consent Decree: Bailly Units 7 and 8 (NO$_X$ and SO$_2$); Michigan City Unit 12 (NO$_X$ and SO$_2$); Schahfer Unit 14 (NO$_X$ and SO$_2$); Schahfer Unit 15 (SO$_2$) and Schahfer Units 17 and 18 (SO$_2$). Schahfer Unit 15 can become an Improved Unit for NOx, if NIPSCO elects NOx Option 1 as described in Table 1 and Paragraph 60 of this Consent Decree. Schahfer Unit 15 can also become an Improved Unit for NOx if NIPSCO elects NOx Option 2 as described in Table 1 and Paragraph 60 and Schahfer Unit 15 becomes, at NIPSCO's discretion, subject to a federally enforceable 0.080 lb/mmBTU NO$_X$ 30-Day Rolling Average Emission Rate, for which the rate and the requirement to Continuously Operate such SNCR is incorporated into a site-specific amendment to the SIP and modification to the Title V permit. Schahfer Units 17 and 18 can become an Improved Unit for NOx if either Unit is equipped with an SCR (or equivalent NO$_X$ control technology approved pursuant to Paragraph 65) and has become subject to a federally enforceable 0.080 lb/mmBTU NO$_X$ 30-Day Rolling Average Emission Rate, which rate, and the requirement to Continuously Operate such SCR, is incorporated into a site-specific amendment to the SIP and modification to the Title V permit.

28)     "Indiana SIP" means the Indiana state implementation plan approved and enforceable by EPA under Section 110 of the Act.

29)     "lb/mmBTU" means one pound of a pollutant per million British thermal units of heat input.

30)     "Low Sulfur Coal" means coal that will achieve an uncontrolled $SO_2$ emission rate of less than 1.00 lb/mmBTU.

31)     "Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

32)     "Monthly $SO_2$ Removal Efficiency" means the percent reduction in SO2 emissions achieved by the FGD at Bailly Units 7 and 8 during a Calendar Month. This percentage shall be calculated in accordance with the following procedure: (a) first, sum the total pounds of $SO_2$ emitted during a Calendar Month from the outlet at the Bailly main stack (CS001) and the Bailly bypass stack; (b) second, divide that sum by the sum of the total pounds of $SO_2$ during that same Calendar Month that enter the Bailly FGD (as measured at the inlet to the FGD) and are emitted from Bailly bypass stack; (c) third, subtract that result from 1.0 or 100 percent (*i.e.*, if the resulting number is 0.10, subtract 0.10 from 1.0); and, (d) fourth, multiply that result by 100. The pounds of $SO_2$ emitted from the Bailly main stack (CS001), inlet to the FGD, and bypass stack shall be determined from data derived from $SO_2$ CEMS installed and operated at Bailly. Emissions associated with a Malfunction that is determined to be a Force Majeure Event pursuant to Section XVI of this Consent Decree shall be excluded from the calculation of a Monthly $SO_2$ Removal Efficiency.

33)     "MW" means a megawatt or one million watts.

- 12 -

34)     "National Ambient Air Quality Standards" and "NAAQS" mean the national ambient air quality standards that are promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409.

35)     "NIPSCO" means Northern Indiana Public Service Co.

36)     "NIPSCO System" means the following coal-fired, electric steam-generating Units owned by NIPSCO and located in the State of Indiana, with estimated net demonstrated generating capacities for such Units listed in parentheses below:

    a.     the Bailly Electric Generation Station ("Bailly") in Porter County, IN, comprised of Unit 7 (160 MW) and Unit 8 (320 MW);

    b.     the Michigan City Generating Station ("Michigan City") in LaPorte County, IN, comprised of Unit 12 (469 MW);

    c.     the Rollin M. Schahfer Electric Generating Station ("Schahfer") in Jasper County, IN, comprised of Unit 14 (431 MW), Unit 15 (472 MW), Unit 17 (361 MW), and Unit 18 (361 MW); and

    d.     the Dean H. Mitchell Electric Generating Station ("Mitchell") in Lake County, IN, comprised of Unit 4 (110 MW), Unit 5 (125 MW), Unit 6 (126 MW), and Unit 11 (125 MW).

37)     "Nonattainment New Source Review" and "Nonattainment NSR" mean the nonattainment area New Source Review ("NSR") program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, and 40 C.F.R. Part 51, as well as any Nonattainment NSR provisions of the Indiana SIP.

38)     "$NO_X$" means oxides of nitrogen.

- 13 -

39)     "$NO_X$ Allowance" means an authorization or credit to emit a specified amount of $NO_X$ that is allocated or issued under an emissions trading or marketable permit program of any kind that has been established under the Clean Air Act or the Indiana SIP.

40)     "Over- Fired Air" and "OFA" mean an in-furnace staged combustion control to reduce $NO_X$ emissions.

41)     "Operating Day" means any calendar day during which a Unit fires Fossil Fuel.

42)     "Other Unit" means any Unit within the NIPSCO System that is not an Improved Unit for the pollutant in question.  A Unit may be an Improved Unit for $NO_X$ and an Other Unit for $SO_2$, and vice versa.

43)     "Ownership Interest" means part or all of NIPSCO's legal or equitable ownership interest in the NIPSCO System Units.

44)     "Parties" means the United States, including the EPA and the United States Department of Justice, the State of Indiana, including the Indiana Attorney General and the Indiana Department of Environmental Management, and NIPSCO.

45)     "Plaintiff(s)" means the United States, including the EPA and the United States Department of Justice, and the State of Indiana, including the Indiana Attorney General and the Indiana Department of Environmental Management ("IDEM").

46)     "PM Control Device" means any device, including an ESP or a fullstream baghouse, that reduces emissions of particulate matter ("PM").

47)     "PM" means particulate matter.

- 14 -

48)     "PM Continuous Emission Monitoring System" and "PM CEMS" mean the equipment that samples, analyzes, measures, and provides, by readings taken at frequent intervals, an electronic or paper record of PM emissions.

49)     "PM Emission Rate" means the number of pounds of PM emitted per million BTU of heat input ("lb/mmBTU").

50)     "Project Dollars" means NIPSCO's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section X (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both:  (a) comply with the requirements set forth in Section X (Environmental Mitigation Projects) and Appendix A of this Consent Decree; and (b) constitute NIPSCO's direct payments for such projects, NIPSCO's external costs for contractors, vendors, and equipment, or NIPSCO's internal costs consisting of employee time, travel, or out-of-pocket expenses specifically attributable to these particular projects and documented in accordance with GAAP.

51)     "PSD" means Prevention of Significant Deterioration program within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492 and 40 C.F.R. Part 52, as well as any PSD provisions of the Indiana SIP.

52)     "Retire" or "Retirement" means to permanently cease to operate, physically render inoperable, and relinquish all Clean Air Act permits for a Unit within the NIPSCO System.

53)     "Selective Catalytic Reduction System" and "SCR" mean a pollution control device that employs selective catalytic reduction technology for the reduction of $NO_X$ emissions.

- 15 -

54)     "Selective Non-Catalytic Reduction System" and "SNCR" mean a pollution control device that employs selective non-catalytic reduction technology for the reduction of $NO_X$ emissions.

55)     "$SO_2$" means sulfur dioxide.

56)     "$SO_2$ Allowance" means "allowance" as defined at  42 U.S.C. § 7651a(3): "an authorization, allocated to an affected unit by the Administrator of EPA under Subchapter IV of the Act, to emit, during or after a specified calendar year, one ton of sulfur dioxide."

57)     "Surrender" means permanently surrendering NOx or $SO_2$ allowances so that such NOx or SO2 allowances can never be used to meet any compliance requirement under the Clean Air Act, the Indiana SIP, or this Consent Decree.

58)     "Title V Permit" means the permit required for NIPSCO's major sources under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661f.

59)     "Unit" means, collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment, at or serving a coal-fired steam electric generating unit.  An electric steam generating station may comprise one or more Units.

## IV.   $NO_X$ EMISSION REDUCTIONS AND CONTROLS

### A.   $NO_X$ Emission Controls

60)     Commencing for each Unit on the dates set forth in Table 1 below, NIPSCO shall Continuously Operate the NOx control technology at each Unit in the

NIPSCO System as stated in Table 1 and achieve and continuously maintain the 30-Day

Rolling Average Emission Rates for NOx set forth in Table 1.

Table 1

| Unit | Control Technology | 30-Day Rolling Average Emission Rate (lb/mmBTU) | Date required to meet 30-Day Rolling Average Emission Rate |
|------|--------------------|--------------------------------------------------|-----------------------------------------------------------|
| Bailly Units 7 and 8 | Bailly Unit 7 SCR; Bailly Unit 8 SCR | 0.180 | March 31, 2011 |
| Michigan City Unit 12 | SCR | 0.160 | March 31, 2011 |
| | NOx Option A: SCR<br><br>NOx Option B: Retire | NOx Option A: 0.160<br><br>NOx Option B: N/A | December 31, 2018 |
| Schahfer Unit 14 | SCR | 0.160 | March 31, 2011 |
| Schahfer Unit 15 | LNB/OFA | 0.180 | January 31, 2011 |
| | NOx Option 1:  SCR<br><br>NOx Option 2: SNCR | NOx Option 1: 0.080<br><br>NOx Option 2:  0.150 | NOx Option 1: December 31, 2015<br><br>NOx Option 2: December 31, 2012 |
| Schahfer Unit 17 | LNB/OFA | 0.200 | March 31, 2011 |
| Schahfer Unit 18 | LNB/OFA | 0.200 | March 31, 2011 |

61)      By December 31, 2014, NIPSCO shall notify EPA of its decision to

implement either NOx Option A or NOx Option B for Michigan City Unit 12 as described

in Table 1.

62)      By December 31, 2011, NIPSCO shall notify EPA of its decision to

implement either NOx Option 1 or NOx Option 2 for Schahfer Unit 15 as described in

Table 1.

63)     Commencing for each Cyclone-fired Unit on the dates set forth in Table 2 below, NIPSCO shall Continuously Operate the NOx control technology at each Cyclone-fired Unit in the NIPSCO System as stated in Table 2 and achieve and continuously maintain the 365-Day Rolling Average Emission Rates for NOx set forth in Table 2.

Table 2

| Unit | Control Technology | 365-Day Rolling Average Emission Rate (lb/mmBTU) | Date required to meet 365-Day Rolling Average Emission Rate |
|------|--------------------|--------------------------------------------------|------------------------------------------------------------|
| Bailly Units 7 and 8 | Bailly Unit 7 SCR; Bailly Unit 8 SCR | 0.150 | December 31, 2010 |
| | | 0.130 | December 31, 2013 |
| | | 0.120 | December 31, 2015 |
| Michigan City Unit 12 | SCR | 0.140 | December 31, 2010 |
| | | 0.120 | December 31, 2011 |
| | | 0.100 | December 31, 2013 |
| Schahfer Unit 14 | SCR | 0.140 | December 31, 2010 |
| | | 0.120 | December 31, 2012 |
| | | 0.100 | December 31, 2014 |

64)     Beginning forty five (45) days from the Date of Entry of this Consent Decree, NIPSCO shall Continuously Operate low NOx burners ("LNB") and/or OFA on the NIPSCO System Units according to Table 3 below.

Table 3

| NIPSCO System Unit | NOx Control Technology |
|--------------------|------------------------|
| Bailly Unit 7 | OFA |
| Bailly Unit 8 | OFA |
| Michigan City Unit 12 | OFA |
| Schahfer Unit 14 | OFA |
| Schahfer Unit 15 | LNB/OFA |
| Schahfer Unit 17 | LNB/OFA |

| Schahfer Unit 18 | LNB/OFA |
|---|---|

65)      With prior written notice to the Plaintiffs and written approval from EPA (after consultation by EPA with the State of Indiana), NIPSCO may, in lieu of installing and operating SCR or SNCR technology at a Unit, install and operate at that Unit equivalent NOx control technology so long as such equivalent NOx control technology has been demonstrated to be capable of achieving and maintaining a 30-Day Rolling Average Rate for NOx of not more than 0.080 lb/mmBTU for that NIPSCO Unit.  If NIPSCO elects to install and operate equivalent NOx control technology at a Unit, it must commence operation of the equivalent NOx control technology at that Unit by the date specified for SCR or SNCR installation in Table 1 or Table 2.  Upon installation of such equivalent NOx control technology at a Unit as a means of complying with Table 1 or 2, NIPSCO shall Continuously Operate and achieve and maintain a 30-Day Rolling Average Emission Rate for NOx of not more than 0.080 lb/mmBTU at that Unit.

**B.      General NO$_X$ Provision**

66)      In determining Emission Rates for NO$_X$, NIPSCO shall use CEMS in accordance with the procedures of 40 C.F.R. Part 75.

**C.      Annual System Tonnage Limitation for NO$_X$**

67)      In addition to meeting the emission limits set forth in Tables 1 and 2, all Units in the NIPSCO System, collectively, shall not emit NO$_X$ in excess of the Annual System Tonnage Limitations calculated on a calendar-year basis set forth in Table 4.

Table 4:

| Applicable Calendar Year | Annual NIPSCO System Tonnage Limitation for NO$_X$ |
|---|---|
| 2011 | 15,825 tons |
| 2012 | 15,537 tons |
| 2013 | If NIPSCO selects NOx Option 1 in Table 1 (SCR on Schahfer Unit 15): 15,247 tons<br><br>If NIPSCO selects NOx Option 2 in Table 1(SNCR on Schahfer Unit 15): 13,752 tons |
| 2014 | If NIPSCO selects NOx Option 1 in Table 1 (SCR on Schahfer Unit 15): 14,959 tons<br><br>If NIPSCO selects NOx Option 2 in Table 1 (SNCR on Schahfer Unit 15): 13,464 tons |
| 2015 | If NIPSCO selects NOx Option 1 in Table 1 (SCR on Schahfer Unit 15):  14,365 tons<br><br>If NIPSCO selects NOx Option 2 in Table 1 (SNCR on Schahfer Unit 15): 12,870 |
| 2016 | If NIPSCO selects NOx Option 1 in Table 1 (SCR on Schahfer Unit 15):  11,704 tons<br><br>If NIPSCO selects NOx Option 2 in Table 1 (SNCR on Schahfer Unit 15): 12,870 |
| 2017 | Same as 2016 |

for sale or trade as a result of the actions taken by NIPSCO to comply with the requirements, as they become due, of this Consent Decree.

70)     For any given calendar year, provided that NIPSCO is in compliance for that calendar year with all emissions limitations for NOx set forth in this Consent Decree, nothing in this Consent Decree, including the requirement to Surrender NOx allowances under Paragraph 71 of this Consent Decree, shall preclude NIPSCO from selling or trading $NO_X$ Allowances allocated to the NIPSCO System that become available for sale or trade that calendar year solely as a result of:

    a.    the installation and operation at any time of any NOx pollution control technology or technique that is not otherwise required by this Consent Decree, or the installation and operation of NOx controls prior to the dates required under this Section IV of this Consent Decree; or

    b.    achievement and maintenance of a $NO_X$ 30-Day Rolling Average Emission Rate at any non-cyclone NIPSCO System Unit, as determined on a unit by unit basis, below the emission rate specified for such Unit in Table 1; or for any NIPSCO Cyclone-fired Unit, as determined on a unit by unit basis, achievement and maintenance of a NOx 30-Day Rolling Average Emission Rate below 0.100 lb/mmBTU for such Cyclone-fired Unit, and a NOx 365-Day Rolling Average Emission Rate below the emission rate specified for such Cyclone-fired Unit in Table 2,

so long as NIPSCO timely reports the generation of such surplus $NO_X$ Allowances that occur after the Date of Entry of this Consent Decree in accordance with Section XIII (Periodic Reporting) of this Consent Decree.

- 22 -

71)      Beginning with calendar year 2011, and continuing each calendar year
thereafter, NIPSCO shall Surrender to EPA, or transfer to a non-profit third party selected
by NIPSCO for Surrender, all NOx Allowances allocated to the NIPSCO System Units for
that calendar year that NIPSCO does not need in order to meet its own federal and/or state
Clean Air Act statutory or regulatory requirements.  This requirement to Surrender all such
NOx Allowances allocated to NIPSCO for a given calendar year is subject to Paragraph 70
of this Consent Decree.  NIPSCO shall make such Surrender annually, within forty-five
(45) days of NIPSCO's receipt of the Annual Deduction Reports for NOx  from EPA.
Surrender need not include the specific NOx Allowances that were allocated to NIPSCO
System Units, so long as NIPSCO Surrenders NOx Allowances that are from the same year
or an earlier year and that are equal to the number required to be Surrendered under this
Paragraph.

72)      If any NOx allowances are transferred directly to a non-profit third party,
NIPSCO shall include a description of such transfer in the next report submitted to EPA
and the State of Indiana pursuant to Section XIII (Periodic Reporting) of this Consent
Decree.  Such report shall:  (i) provide the identity of the non-profit third-party recipient(s)
of the NOx Allowances and a listing of the serial numbers of the transferred NOx
Allowances; and (ii) include a certification by the third-party recipient(s) stating that the
recipient(s) will not sell, trade, or otherwise exchange any of the allowances and will not
use any of the NOx Allowances to meet any obligation imposed by any environmental law.
No later than the third periodic report due after the transfer of any NOx Allowances,
NIPSCO shall include a statement that the third-party recipient(s) Surrendered the NOx
Allowances for permanent Surrender to EPA in accordance with the provisions of

- 23 -

Paragraph 71 within one (1) year after NIPSCO transferred the NOx Allowances to them. NIPSCO shall not have complied with the NOx Allowance Surrender requirements of this Paragraph until all third-party recipient(s) shall have actually Surrendered the transferred NOx Allowances to EPA.

73)    For all NOx Allowances Surrendered to EPA, NIPSCO or the third-party recipient(s) (as the case may be) shall first submit a NOx Allowance transfer request form to the EPA Office of Air and Radiation's Clean Air Markets Division ("CAMD") directing the transfer of such NOx Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing.  As part of submitting these transfer requests, NIPSCO or the third-party recipient(s) shall irrevocably authorize the transfer of these NOx Allowances and identify by name of account and any applicable serial or other identification numbers or station names the source and location of the NOx Allowances being Surrendered.

74)    Nothing in this Consent Decree shall prevent NIPSCO from purchasing or otherwise obtaining $NO_X$ Allowances from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.  Such allowances will not be used to demonstrate compliance with the annual tonnage caps of this Consent Decree.

75)    The requirements in Paragraphs 69 through 74 of this Consent Decree pertaining to NIPSCO's use or Surrender of $NO_X$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree.

## V.   SO$_2$ EMISSION REDUCTIONS AND CONTROLS

### A.   SO$_2$ Emission Controls

76)   Commencing for each Unit on the dates set forth in Table 5 below,

NIPSCO shall Continuously Operate the FGDs at each Unit in the NIPSCO System as

stated in Table 5 and achieve and continuously maintain the 30-Day Rolling Average

Emission Rate or applicable SO$_2$ 30-Day Rolling Average Removal Efficiency or Monthly

SO$_2$ Removal Efficiency as set forth in Table 5.

Table 5

| Unit | Control Technology | 30-Day Rolling Average Emission Rate (lb/mmBTU) / Removal Efficiency & Monthly SO$_2$ Removal Efficiency | Date required to meet emission rate/removal efficiency |
|---|---|---|---|
| Bailly Units 7 and 8 | Upgrade existing FGD on Bailly 7 and 8 main stack | 95.0% Monthly SO$_2$ Removal Efficiency | January 1, 2011 |
| | | 97.0% 30-Day Rolling Average SO2 Removal Efficiency or 95.0% 30-Day Rolling Average SO$_2$ Removal Efficiency if Bailly Units 7 and 8 burn only Low Sulfur Coal for that entire 30-day period | January 1, 2014 |
| Michigan City Unit 12 | SO$_2$ Option 1: Retire

SO$_2$ Option 2: FGD | SO$_2$ Option 1: N/A

SO$_2$ Option 2: 0.100 lb/mmbtu 30-Day Rolling Average Emission Rate | December 31, 2018 |
| Schahfer Unit 14 | FGD | 0.080 lb/mmbtu 30-Day Rolling Average Emission Rate | December 31, 2013 |
| Schahfer Unit 15 | FGD | 0.080 lb/mmbtu 30-Day Rolling Average Emission Rate | December 31, 2015 |
| Schahfer Unit 17 | Upgrade existing FGD | 97.0 % 30-Day Rolling Average Removal Efficiency | January 31, 2011 |
| Schahfer Unit 18 | Upgrade | 97.0 % 30-Day Rolling Average | January 31, 2011 |

| | existing FGD | Removal Efficiency | |
|---|---|---|---|

77)      By December 31, 2014, NIPSCO shall notify EPA of its decision to implement either $SO_2$ Option 1 or $SO_2$ Option 2 for Michigan City Unit 12 as described in Table 5.

78)      NIPSCO utilizes a main stack (CS00001) through which air emissions from both Bailly Units 7 and 8 are routed. NIPSCO has in place an existing contract with Pure Air, a separate entity, under which Pure Air owns and operates an FGD controlling SO2 emissions from Bailly Units 7 and 8. This FGD controls $SO_2$ emissions from both Bailly Units 7 and 8. During periods of startup, the FGD and the main stack cannot be used for the unit(s) experiencing startup. When either or both Bailly Units 7 and 8 are experiencing startup, emissions from the unit(s) experiencing startup are routed through a bypass stack that serves Bailly Unit 7 and Unit 8 around the FGD and these emissions are not controlled by the FGD. While combusting fuel, emissions from a Bailly unit shall be routed through the FGD unless that unit is experiencing startup. The following restrictions shall apply to NIPSCO's use of the bypass stack:

     a.      While combusting fuel, NIPSCO shall not use the Bailly Unit 7 and Unit 8 bypass stack for any emission purpose other than during periods of startup, and then may only use it for the unit(s) experiencing startup.

     b.      All $SO_2$ emissions associated with periods of startup are included in the calculation of the Monthly $SO_2$ Removal Efficiency and 30-Day Rolling Average $SO_2$ Removal Efficiency for Bailly Unit 7 and 8 as described in Table 5, except that NIPSCO may exclude from that calculation those

startup emissions from a unit that occur up until that unit reaches a temperature of 280 degrees Fahrenheit as measured at the outlet of the precipitator, not to exceed 16 hours in duration per startup while combusting coal. NIPSCO may however, exclude from the relevant removal efficiency, startup emissions that occur after the 16th hour up to the 24th hour, if NIPSCO Surrenders $SO_2$ Allowances in an amount equal to the difference between the actual tons of $SO_2$ emitted from the bypass stack between hour 17 and the point in time NIPSCO ceases use of the bypass stack for startup emissions (but, in any event, no longer than hour 24) and the tons of $SO_2$ emissions that would have been emitted assuming compliance with the relevant removal efficiency for Bailly Unit 7 and 8 specified in Table 5. In addition, NIPSCO may only exclude these limited unit startup emissions for the Bailly bypass stack if NIPSCO demonstrates to EPA that such emissions otherwise would cause NIPSCO to violate the relevant removal efficiency for Bailly Unit 7 or 8 as described in Table 5. Such demonstration shall require that NIPSCO, at minimum, provide EPA with calculations of emissions with and without bypass stack emissions;

c.   NIPSCO shall limit the use of the bypass stack to the greatest extent practicable;

d.   NIPSCO shall operate the bypass stack consistent with good engineering and maintenance practices for minimizing emissions to the extent practicable; and

e.      Annual System Tonnage Limitations in Tables 4 and 6 shall apply during all periods of emissions, including all periods of bypass stack emissions.

79)     In the event that the Monthly $SO_2$ Removal Efficiency requirements for Bailly Unit 7 and Unit 8 as listed in Table 5 are not achieved for any given Calendar Month prior to January 1, 2014 after applying Paragraph 78, as applicable, NIPSCO may nonetheless remain in compliance with the requirements of this Section V ($SO_2$ Emissions Reduction and Controls) by Surrendering the number of $SO_2$ Allowances equal to two times (2x) the difference between the actual tons of $SO_2$ emitted from the Bailly main stack (CS001) during such Calendar Month minus the tons of $SO_2$ emissions that would have been emitted from that stack during that Calendar Month had NIPSCO complied with the applicable Monthly $SO_2$ Removal Efficiency specified in Table 5.  In all cases where the applicable Monthly $SO_2$ Removal Efficiency is not achieved for a given Calendar Month prior to January 1, 2014, the difference between the actual $SO_2$ emissions emitted and the compliance level of $SO_2$ emissions during such Calendar Month shall be rounded up to the next highest ton (e.g., if the difference is 750 pounds, then the difference shall be rounded up to one ton and $SO_2$ Allowances equal to two tons would be required to be retired).  Any allowances retired under this Paragraph 79 shall be in addition to any allowances that NIPSCO is otherwise required to Surrender to EPA or transfer to a non-profit third party pursuant to Paragraph 86 and 87 of this Consent Decree.  After January 1, 2014, the method described in this Paragraph 79 may not be used to comply with the requirements of this Section.

80)     After prior written notice to the Plaintiffs and prior written approval from EPA (after consultation by EPA with the State of Indiana), NIPSCO may, in lieu of

installing and operating FGD technology at Schahfer Unit 15, install and operate equivalent $SO_2$ control technology, so long as such equivalent $SO_2$ control technology has been demonstrated to be capable of achieving and maintaining a 30-Day Rolling Average Rate for $SO_2$ of not more than 0.080 lb/mmBTU, and so long as NIPSCO commences operation of the equivalent $SO_2$ control technology by the date specified for FGD installation in Table 5. If it elects to request equivalent $SO_2$ technology, NIPSCO shall provide the written notice referenced above no later than December 31, 2012. Upon installation of such equivalent $SO_2$ control technology as a means of complying with Table 5, NIPSCO shall achieve and maintain a 30-Day Rolling Average Emission Rate for $SO_2$ of not more than 0.080 lb/mmBTU at that Unit.

**B.**     **General SO2 Provisions**

81)     In determining Emission Rates for $SO_2$, NIPSCO shall use CEMS in accordance with the procedures of 40 C.F.R. Part 75.

**C.**     **Annual System Tonnage Limitation for $SO_2$**

82)     In addition to meeting the emission limits set forth in Table 5, all Units in the NIPSCO System, collectively, shall not emit $SO_2$ in excess of the Annual System Tonnage Limitations calculated on a calendar-year basis set forth in Table 6.

Table 6:

| Applicable Calendar Year | Annual NIPSCO System Tonnage Limitation for $SO_2$ |
|---|---|
| 2011 | 50,200 tons |
| 2012 | Same as 2011 |

| 2013 | Same as 2011 |
|------|--------------|
| 2014 | 35,900 tons |
| 2015 | Same as 2014 |
| 2016 | 25,300 tons |
| 2017 | Same as 2016 |
| 2018 | Same as 2016 |
| 2019 and thereafter | If NIPSCO selects $SO_2$ Option 2 (Michigan City Unit 12 FGD): 11,600 tons<br><br>If NIPSCO selects $SO_2$ Option 1 (Retirement of Michigan City Unit 12): 10,200 tons |

83)       Except as may be necessary to comply with Section XV (Stipulated Penalties), and except as permitted or required under Paragraphs 78 and 79, NIPSCO may not use $SO_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required by this Decree by using, tendering, or otherwise applying $SO_2$ Allowances to offset any excess emissions (i.e., emissions above the limits specified in Table 5 and Table 6).

**D.       Use and Surrender of $SO_2$ Allowances**

84)       Except as provided in this Consent Decree, NIPSCO shall not sell or trade any $SO_2$ Allowances allocated to the NIPSCO System that would otherwise be available for sale or trade as a result of the actions taken by NIPSCO to comply with the requirements, as they become due, of this Consent Decree.

- 30 -

85)      For any given calendar year, provided that the NIPSCO System is in compliance for that calendar year with all emissions limitations for $SO_2$ set forth in this Consent Decree, nothing in this Consent Decree, including the requirement to Surrender $SO_2$ Allowances under Paragraph 86 of this Consent Decree, shall preclude NIPSCO from selling or trading $SO_2$ Allowances allocated to the NIPSCO System that become available for sale or trade that calendar year solely as a result of:

    a.      the installation and operation of any pollution control technology or technique that is not otherwise required by this Consent Decree, or the installation and operation of any FGD prior to the dates required by Section V of this Consent Decree; or

    b.      achievement and maintenance of an $SO_2$ 30-Day Rolling Average Removal Efficiency, 30-Day Rolling Average Emission Rate, or Monthly SO2 Removal Efficiency at any NIPSCO System Unit, as determined on a unit by unit basis, at a higher removal efficiency than the $SO_2$ 30-Day Rolling Average Removal Efficiency or Monthly $SO_2$ Removal Efficiency specified for such Unit, or below the $SO_2$ 30-Day Rolling Average Emission Rate specified for such Unit,

so long as NIPSCO timely reports the generation of such surplus $SO_2$ Allowances that occur after the Date of Entry of the Consent Decree in accordance with Section XIII (Periodic Reporting) of this Consent Decree.

86)      Beginning with calendar year 2011, and continuing each calendar year thereafter, NIPSCO shall Surrender to EPA, or transfer to a non-profit third party selected by NIPSCO for Surrender, all $SO_2$ Allowances allocated to the NIPSCO System Units for

- 31 -

that calendar year that NIPSCO does not need in order to meet its own federal and/or state Clean Air Act statutory or regulatory requirements. This requirement to Surrender all such $SO_2$ Allowances is subject to Paragraph 85 of this Consent Decree. NIPSCO shall make such Surrender annually, within forty-five (45) days of NIPSCO's receipt of the Annual Deduction Reports for $SO_2$ from EPA. Surrender need not include the specific $SO_2$ Allowances that were allocated to NIPSCO System Units, so long as NIPSCO surrenders $SO_2$ Allowances that are from the same year or an earlier year and that are equal to the number required to be surrendered under this Paragraph.

87)     If any allowances are transferred directly to a non-profit third party, NIPSCO shall include a description of such transfer in the next report submitted to EPA and the State of Indiana pursuant to Section XIII (Periodic Reporting) of this Consent Decree. Such report shall: (i) provide the identity of the non-profit third-party recipient(s) of the $SO_2$ Allowances and a listing of the serial numbers of the transferred $SO_2$ Allowances; and (ii) include a certification by the third-party recipient(s) stating that the recipient(s) will not sell, trade, or otherwise exchange any of the allowances and will not use any of the $SO_2$ Allowances to meet any obligation imposed by any environmental law. No later than the third periodic report due after the transfer of any $SO_2$ Allowances, NIPSCO shall include a statement that the third-party recipient(s) Surrendered the $SO_2$ Allowances for permanent surrender to EPA in accordance with the provisions of Paragraph 86 within one (1) year after NIPSCO transferred the $SO_2$ Allowances to them. NIPSCO shall not have complied with the $SO_2$ Allowance Surrender requirements of this Paragraph until all third-party recipient(s) shall have actually Surrendered the transferred $SO_2$ Allowances to EPA.

88)     For all $SO_2$ Allowances surrendered to EPA, NIPSCO or the third-party recipient(s) (as the case may be) shall first submit an $SO_2$ Allowance transfer request form to the EPA Office of Air and Radiation's Clean Air Markets Division ("CAMD") directing the transfer of such $SO_2$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing.  As part of submitting these transfer requests, NIPSCO or the third-party recipient(s) shall irrevocably authorize the transfer of these $SO_2$ Allowances and identify by name of account and any applicable serial or other identification numbers or station names the source and location of the $SO_2$ Allowances being surrendered.

89)     Nothing in this Consent Decree shall prevent NIPSCO from purchasing or otherwise obtaining $SO_2$ Allowances from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.  Such allowances shall not be used to demonstrate compliance with the annual tonnage caps of this Consent Decree.

90)     The requirements in Paragraphs 84 through 89 of this Decree pertaining to NIPSCO's surrender of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Decree.

## VI.   PM EMISSION REDUCTIONS AND CONTROLS

### A.     Optimization of PM Emission Controls

91)     Beginning ninety (90) days after the Date of Entry of this Consent Decree, and continuing thereafter, NIPSCO shall Continuously Operate each PM Control Device on each Unit within the NIPSCO System, to maximize the PM emission reductions at all times when the unit is in operation, provided that such operation of the PM Control Device is

consistent with the technological limitations, manufacturer's specifications and good engineering and maintenance practices for the PM Control Device. During any periods when any section or compartment of the PM control device is not operational, NIPSCO will minimize emissions to the extent practicable (as defined in 40 C.F.R. § 60.11(d)). Notwithstanding the foregoing sentences of this Paragraph 91, NIPSCO shall not be required to operate an ESP on any Unit if a fullstream baghouse is installed and operating to replace the ESP . Specifically, NIPSCO shall, at a minimum, to the extent practicable, and where applicable: (a) energize each available section of the ESP for each Unit, or at each Unit where a baghouse is installed, operate each compartment of the baghouse for each such Unit, regardless of whether that action is needed to comply with opacity limits; (b) maintain the energy or power levels delivered to the ESPs for each Unit to achieve optimal removal of PM, or at each Unit where a baghouse is installed, maintain and replace bags on each baghouse as needed to maximize collection efficiency; (c) at each Unit inspect the ESP or the baghouse (at any Unit where a baghouse is installed) for any openings or leakage in the casings, ductwork and expansion joints, and make best efforts to expeditiously repair and return to service any ESP section or baghouse compartment needing repair; (d) at each Unit where no baghouse is installed or operating, operate automatic control systems on the ESP, including the plate-cleaning and discharge electrode cleaning systems, to maximize control efficiency; and (e) at each Unit where a baghouse is installed and operating, make best efforts to expeditiously repair and return to service any failed baghouse compartment.

### B.    PM Emissions

92)      Beginning for each Unit on the dates specified in Table 7 below, NIPSCO shall achieve and maintain a PM Emission Rate of no greater than 0.030 lb/mmBTU.  If NIPSCO installs a fullstream baghouse on any of the Units identified in Table 7 to replace an existing ESP, pursuant to Paragraph 91 above, NIPSCO shall, upon installation of such baghouse, achieve and maintain a PM Emission Rate of no greater than 0.015 lb/mmBTU.

Table 7

| NIPSCO System Unit | Date |
|---|---|
| Bailly Units 7 and 8 Main Stack (CS001) | December 31, 2010 |
| Michigan City Unit 12 | December 31, 2018 |
| Schahfer Unit 14 | December 31, 2013 |
| Schahfer Unit 15 | December 31, 2015 |
| Schahfer Unit 17 | December 31, 2010 |
| Schahfer Unit 18 | December 31, 2010 |

### C.    PM Emissions Testing

93)      Beginning in calendar year 2011 and continuing in each calendar year thereafter, NIPSCO shall conduct a PM performance test on each NIPSCO System Unit identified in Table 7.  The annual performance test requirement imposed on NIPSCO by this Paragraph may be satisfied by stack tests conducted by NIPSCO as may be required by its permits from the State of Indiana for any year that such stack tests are required under the permits.  NIPSCO may perform testing every other year, rather than every year, provided

- 35 -

that two of the most recently completed test results from tests conducted in accordance with the methods and procedures specified in this Paragraph demonstrate that the PM emissions are equal to or less than 0.015 lb/mmBTU. NIPSCO shall perform testing every year, rather than every other year, beginning in the year immediately following any test result demonstrating that the PM emissions are greater than 0.015 lb/mmBTU.

      D.      **General PM Provision**

      94)      The reference methods and procedures for determining compliance with PM Emission Rates shall be those specified in 40 C.F.R. Part 60, Appendix A, Method 5, or an alternative method that is promulgated by EPA, requested for use herein by NIPSCO, and approved for use herein by EPA and IDEM. Use of any particular method shall conform to the EPA requirements specified in 40 C.F.R. Part 60, Appendix A and 40 C.F.R. §§ 60.48a (b) and (e), or any federally approved method contained in the Indiana SIP. NIPSCO shall calculate the PM Emission Rates from the stack test results in accordance with 40 C.F.R. § 60.8(f). The results of each PM stack test shall be submitted to EPA and IDEM within forty-five (45) days of completion of each test.

## VII.    UNIT RETIREMENT

      95)      No later than December 31, 2010, NIPSCO shall Retire Mitchell Units 4, 5, 6, and 11.

      96)      If NIPSCO elects to Retire any Unit within the NIPSCO System other than Michigan City Unit 12 or Mitchell Units 4,5,6, and 11, such Retirement shall not alter the Annual System Tonnage Limitations as described in Tables 4 and 6.

VIII.  **PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS**

97)      Emission reductions that result from actions to be taken by NIPSCO after the Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a netting or offset credit under the Clean Air Act's Nonattainment NSR and PSD programs.

98)      The limitations on the generation and use of netting credits or offsets set forth in the previous Paragraph 97 do not apply to emission reductions achieved by NIPSCO System Units that are greater than those required under this Consent Decree.  For purposes of this Paragraph, emission reductions from a NIPSCO System Unit are greater than those required under this Consent Decree if, for example, they result from NIPSCO's compliance with federally enforceable emission limits that are more stringent than those limits imposed on the NIPSCO System and individual Units under this Consent Decree and under applicable provisions of the Clean Air Act or the Indiana SIP.

99)      Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the State of Indiana or EPA as creditable contemporaneous emission decreases for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS.

100)      Nothing in this Consent Decree precludes any emissions from any NIPSCO System Units that occur either prior to the Date of Entry of this Consent Decree or thereafter from being considered in any modeling analyses required pursuant to 40 C.F.R. Part 52 or the Prevention of Significant Deterioration regulations under the Indiana

SIP for purposes of demonstrating compliance with PSD increments or air quality related values, including visibility, in a Class I area.

## IX.   PM AND MERCURY CONTINUOUS EMISSION MONITORING SYSTEMS (CEMS)

101)      Within eighteen months after the Date of Entry of this Consent Decree, or within 90 days of EPA's approval of NIPSCO's timely submittal under Paragraph 104, whichever is later, NIPSCO shall install, certify, maintain, and operate two PM CEMS and two mercury CEMS.  NIPSCO shall install each PM CEMS and mercury CEMS such that representative measurements of emissions are obtained from the monitored unit(s).  Each CEMS shall complete a minimum of one cycle of operations (sampling, analyzing and data recording) for each successive 15-minute period.  Except for CEMS breakdowns, repairs, calibration checks, and zero and span adjustments, NIPSCO shall continuously operate the PM CEMS and mercury CEMS consistent with technical limitations and manufacturer specifications.

102)      The PM CEMS identified in Paragraph 101 above, shall be installed at NIPSCO's Michigan City Unit 12 and Schahfer Unit 15.  The PM CEMS shall comprise a continuous particle mass monitor measuring particulate matter concentration, directly or indirectly, on a continuous basis.  NIPSCO shall install a diluent monitoring system on Michigan City Unit 12 and Schahfer Unit 15 such that the PM mass concentration can be converted to units of lb/mmBTU.  NIPSCO shall certify the two PM CEMS in accordance with 40 C.F.R. Part 60, Appendix B, Performance Specification 11.  NIPSCO shall submit installation plans, operation plans and perform testing and reporting in accordance with Paragraphs 104 through 106 of this Consent Decree.  In the event NIPSCO elects to retire

Michigan City Unit 12, PM CEMS shall be installed on Schahfer Unit 14 in accordance with the requirements of this Paragraph prior to the retirement of Michigan City Unit 12.

103)     The mercury CEMS identified in Paragraph 101 shall be installed at NIPSCO's Michigan City Unit 12 and Schahfer Unit 15.  The mercury CEMS shall be comprised of a continuous total vapor phase mercury monitoring device which measures total vapor phase mercury concentration, directly or indirectly, on a continuous basis. NIPSCO shall install a diluent monitoring system on Michigan City Unit 12 and Schahfer Unit 15, such that the mercury concentrations can be converted to units of pounds per trillion BTU (lb-mercury/TBTU) on an hourly average basis. NIPSCO shall certify the Mercury CEMS in accordance with 40 C.F.R.  Part 60, Appendix B, Performance Specification 12a.  NIPSCO shall submit installation plans, operation plans and perform testing and reporting in accordance with Paragraphs 104 through 106 of this Consent Decree.  In the event NIPSCO elects to retire Michigan City Unit 12, mercury CEMS shall be installed on Schahfer Unit 14 in accordance with the requirements of this Paragraph prior to the retirement of Michigan City Unit 12.

104)     Within six (6) months after the Date of Entry of this Consent Decree, NIPSCO shall submit to EPA for review and approval pursuant to Section XIV (Review and Approval of Submittals) of this Consent Decree the following information regarding the PM and mercury CEMS:  (a) a plan for the installation, certification and operation of the CEMS; and (b) no less than six (6) months prior to conducting tests in accordance with Paragraph 105 of this Consent Decree a proposed QA/QC protocol that shall be followed in calibrating each PM CEMS and mercury CEMS.  In developing both the plan for installation and certification of the PM and mercury CEMS and the QA/QC protocol,

- 39 -

NIPSCO shall use the criteria set forth in 40 C.F.R. Part 60, Appendix B (PS 11 and PS 12a). EPA shall expeditiously review such submissions. Following approval by EPA, NIPSCO shall thereafter operate the PM and mercury CEMS in accordance with the approved protocols.

105) No later than ninety days (90) after the deadline imposed by Paragraph 101, or within 90 days after EPA's approval of NIPSCO's submittals pursuant to Paragraph 104, whichever is later, NIPSCO shall conduct tests on each PM CEMS and mercury CEMS to demonstrate compliance with the CEMS installation and certification plan submitted to and approved by EPA in accordance with Paragraph 104. NIPSCO shall submit the results of all certification testing (including incomplete testing and associated Reference Method Testing) to EPA and IDEM within forty-five (45) days of completion of certification testing

106) Upon completion of testing in accordance with Paragraph 105 above, NIPSCO shall begin and continue to report to EPA, pursuant to Section XIII (Periodic Reporting), the data recorded by the PM and mercury CEMS, expressed in lb-PM/mmBTU and lb-mercury/TBTU, respectively. The data shall be reported as a three-hour rolling average basis in electronic format, as required by Section XIII, and shall include: each exceedance of an applicable PM mass emission limit (including those occurring during startup, shutdown and/or Malfunction), the magnitude of each exceedance, the date and time of commencement and completion of each period of exceedance, the process operating time during the reporting period, the nature and cause of each exceedance, the corrective action(s) taken or preventative measure(s) adopted in response to each exceedance, the date and time of each period during which any of the CEMS were

- 40 -

inoperative (except for zero and span checks), and the nature of system repairs or adjustments.  For purposes of this Consent Decree, stack testing pursuant to Paragraph 94 shall be the method to determine compliance with the PM Emission Rate established by this Consent Decree.  However, data from the PM CEMS shall be used to, at a minimum, monitor progress in reducing PM emissions.

107)     Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 40 C.F.R. § 52.12(c) (62 Fed. Reg. 8,315; Feb. 27, 1997)) concerning the use of data for any purpose under the Act.

## X.     ENVIRONMENTAL MITIGATION PROJECTS

108)     NIPSCO shall implement the Environmental Mitigation Projects ("Projects") described in Appendix A to this Consent Decree in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree. NIPSCO shall submit plans for the Projects to Plaintiffs for review and approval pursuant to Section XIV (Review and Approval of Submittals) of this Consent Decree in accordance with the schedules set forth in Appendix A.   In implementing the Projects, NIPSCO shall spend no less than $9.5 million in Project Dollars within five (5) years of the Date of Entry of this Consent Decree.  NIPSCO shall maintain, and present to Plaintiffs upon request, all documents to substantiate the Project Dollars expended and shall provide these documents to Plaintiffs within thirty (30) days of a request.

109)     All plans and reports prepared by NIPSCO pursuant to the requirements of this Section of the Consent Decree and required to be submitted to EPA shall be publicly available from NIPSCO without charge.

- 41 -

110)    NIPSCO shall certify, as part of each plan submitted to Plaintiffs for any Project, that NIPSCO is not otherwise required by law to perform the Project described in the plan, that NIPSCO is unaware of any other person who is required by law to perform the Project, and that NIPSCO will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law, including any applicable renewable portfolio standards or energy conservation standards.

111)    NIPSCO shall use good faith efforts to secure as much benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

112)    If NIPSCO elects (where such an election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of NIPSCO, but not including NIPSCO's agents or contractors, that person or instrumentality must, in writing:  (a) identify its legal authority for accepting such funding; and (b) identify its legal authority to conduct the Project for which NIPSCO contributes the funds.  Regardless of whether NIPSCO elected (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, NIPSCO acknowledges that it will receive credit for the expenditure of such funds as Project Dollars only if NIPSCO demonstrates that the funds have been actually spent by either NIPSCO or by the person or instrumentality receiving them (or, in the case of internal costs, have actually been incurred by NIPSCO), and that such expenditures met all requirements of this Consent Decree.

113)    Beginning six (6) months after the Date of Entry of this Consent Decree, and continuing until completion of each Project (including any applicable periods of

- 42 -

demonstration or testing), NIPSCO shall provide Plaintiffs with semi-annual updates concerning the progress of each Project.

114)     Within sixty (60) days following the completion of each Project required under this Consent Decree (including any applicable periods of demonstration or testing), NIPSCO shall submit to Plaintiffs a report that documents the date that the Project was completed, NIPSCO's results from implementing the Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by NIPSCO in implementing the Project (including the emission reductions achieved for $SO_2$, $NO_x$, PM, and $CO_2$).

115)     In connection with any communication to the public or to shareholders regarding NIPSCO's actions or expenditures relating in any way to the Environmental Mitigation Projects in this Consent Decree, NIPSCO shall include prominently in the communication the information that the actions and expenditures were required as part of a consent decree to resolve allegations that NIPSCO violated the Clean Air Act.

## XI.   CIVIL PENALTY

116)     Within thirty (30) calendar days after the Date of Entry of this Consent Decree, NIPSCO shall pay to the United States and the State of Indiana a civil penalty in the amount of $3.5 million, as follows:

(a) NIPSCO shall pay a civil penalty of $ 3.3 million to the United States.  The civil penalty to the United States shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing DOJ Case Number 90-5-2-1-08417 and the civil action case name and case number of this action.  The costs of such

EFT shall be NIPSCO's responsibility.  Payment shall be made in accordance with timely instructions provided to NIPSCO by the Financial Litigation Unit of the U.S. Attorney's Office for the Northern District of Indiana.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, NIPSCO shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XXI (Notices) of this Consent Decree.

(b) NIPSCO shall pay a civil penalty of $200,000 to the State of Indiana. Payment shall be made by check made out to the "Environmental Management Special Fund" and shall be mailed to:

> Indiana Department of Environmental Management
> Cashier- Mail Code 50-10C
> 100 North Senate Avenue
> Indianapolis, IN 46204-2251

117)    Failure to timely pay the civil penalty shall subject NIPSCO to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render NIPSCO liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

118)    Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## XII.   RESOLUTION OF PAST AND FUTURE CLAIMS

### A.   Resolution of Plaintiffs' Civil Claims

119)   <u>Claims of the United States Based on Modifications Occurring Before the Lodging of Decree</u>.  Entry of this Consent Decree shall resolve all civil claims of the United States  under:

    a.   Parts C and D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing federal and state rules, including the Indiana SIP approved under Section 110 of the Act implementing Parts C or D of Subchapter I; and

    b.   Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, and the implementing Title V operating permit program, including regulations that EPA has approved and/or promulgated under the Act, but only to the extent that such claims are based on NIPSCO's failure to obtain or amend an operating permit or failure to submit or amend an operating permit application that reflects applicable requirements imposed under Parts C and D of Subchapter I of the Clean Air Act;

that arose from or are based on any modification that commenced at any NIPSCO System Unit prior to the Date of Lodging of this Consent Decree, including but not limited to those claims and modifications alleged in the Complaint filed by the Plaintiffs in this civil action and those claims and modifications asserted in the NOV issued by EPA to NIPSCO.

120)   <u>Claims of the State of Indiana Based on Modifications Occurring Before the Lodging of Decree</u>.  Entry of this Decree shall resolve all civil claims of the State of Indiana  under:

a.   Parts C and D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 7501-7515, and the implementing federal and state rules, including all civil claims under Indiana regulations at 326 IAC 2-1 *et seq.* (Construction and Operating Permit Requirements), 326 IAC 2-2 *et seq.* (PSD Requirements) and 326 IAC 2-3 *et seq.* (Emission Offset), and any related Indiana statutes, including all versions of the Indiana major New Source Review program that existed at the time of the modifications alleged in the Complaint to any NIPSCO System Unit;

b.   Indiana regulations at 326 IAC 2 that govern minor New Source Review and any related Indiana statutes, including any Indiana rule governing minor New Source Review that existed at the time of the modifications alleged in the Complaint to any NIPSCO System Unit; and

c.   Indiana statutes as they specifically apply to the programs implemented pursuant to Subchapter V of the Act, as well as Indiana regulations at 326 IAC  2-7 *et seq.* (Part 70 Permit Program);

that arose from or are based on any modification that commenced at any NIPSCO System Unit prior to the Date of Lodging of this Consent Decree, including but not limited to those claims and modifications alleged in the Complaint filed by the Plaintiffs in this civil action and those claims and modifications asserted in the NOV issued by EPA to NIPSCO.

121)   Plaintiffs' Claims Based on Modifications After the Lodging of Decree. Entry of this Consent Decree also shall resolve all civil claims of the United States and of the State of Indiana for pollutants, except sulfuric acid mist, regulated under Parts C and D of Subchapter I of the Clean Air Act, and under regulations promulgated as of the Date of

- 46 -

Lodging of this Consent Decree, where such claims are based on any modification completed before December 31, 2018, and

      a.      is commenced at any NIPSCO System Unit after the Date of Lodging; or

      b.      that this Consent Decree expressly directs NIPSCO to undertake.

The term "modification" as used in this Paragraph 121 shall have the meaning that term is given under the Clean Air Act or under the regulations promulgated thereunder as of the Date of Lodging of this Consent Decree. For purposes of this Paragraph 121, civil claims shall not include greenhouse gases (carbon dioxide, nitrous oxide, methane, hydroflurorcarbons, perfluorocarbons, and sulfur hexafluoride) even if greenhouse gases are pollutants regulated under Part C or D of Subchapter I of the Act, and under regulations promulgated thereunder.

      122)    <u>Reopener</u>.  The resolution of the civil claims of the United States and the State of Indiana provided by this Subsection is subject to the provisions of Subsection B of this Section.

**B.**      **<u>Pursuit of Plaintiffs' Civil Claims Otherwise Resolved</u>**

      123)    <u>Bases for Pursuing Resolved Claims Across NIPSCO System</u>.  If NIPSCO violates an Annual Tonnage Limits in Tables 4 or 6, or fails by more than ninety (90) days to complete upgrading of the Bailly FGD or installation and commence operation of any emission control device required pursuant to this Consent Decree; or fails by more than ninety (90) days to retire and permanently cease to operate all Mitchell Units pursuant to Section VII (Unit Retirement), then the United States or the State of Indiana may pursue any claim at any NIPSCO System Unit that has otherwise been resolved under Subsection A of this Section, subject to (a) and (b) below.

- 47 -

a.  For any claims based on modifications undertaken at an Other Unit (i.e. any Unit of the NIPSCO System that is not an Improved Unit for the pollutant in question), claims may be pursued only where the modification(s) on which such claim is based was commenced within the five years preceding the violation or failure specified in this Paragraph.

b.  For any claims based on modifications undertaken at an Improved Unit, claims may be pursued only where the modification(s) on which such claim is based was commenced: (i) after lodging of the Consent Decree, and (ii) within the five years preceding the violation or failure specified in this Paragraph.

124)  <u>Additional Bases for Pursuing Resolved Claims for modifications at an Improved Unit.</u> Solely with respect to Improved Units, the United States or the State of Indiana  may also pursue claims arising from a modification (or collection of modifications) at an Improved Unit that have otherwise been resolved under Section XII, Subsection A, if the modification (or collection of modifications) at the Improved Unit on which such claim is based: (i) was commenced after the Date of Lodging, and (ii) individually (or collectively) increased the maximum hourly emission rate of that Unit for $NO_x$ or $SO_2$ (as measured by 40 C.F.R. § 60.14 (b) and (h)) by more than ten percent (10%).

125)  <u>Additional Bases for Pursuing Resolved Claims for Modifications at an Other Unit.</u> Solely with respect to Other Units, the United States or the State of Indiana may also pursue claims arising from a modification (or collection of modifications) at an Other Unit that have otherwise been resolved under Section XII, Subsection A, if the

- 48 -

modification (or collection of modifications) on which the claim is based was commenced within the five years preceding any of the following events:

  a.    a modification (or collection of modifications) at such Other Unit commenced after the Date of Lodging that increases the maximum hourly emission rate for such Other Unit for the relevant pollutant (only $NO_x$ or $SO_2$) as measured by 40 C.F.R. § 60.14(b) and (h);

  b.    the aggregate of all Capital Expenditures paid at such Other Unit exceed $150/KW on the Unit's Boiler Island (based on the capacity numbers included in Paragraph 36) during January 1, 2011, through December 31, 2017.  (Capital Expenditures shall be measured in calendar year 2009 constant dollars, as adjusted by the McGraw-Hill Engineering News-Record Construction Cost Index); or

  c.    a modification (or collection of modifications) at such Other Unit commenced after the Date of Lodging results in an emissions increase of $NO_x$ and/or $SO_2$ at such Other Unit, and such increase:

    i.    presents, by itself, or in combination with other emissions or sources, "an imminent and substantial endangerment" within the meaning of Section 303 of the Act, 42 U.S.C. §7603;

    ii.   causes or contributes to violation of a NAAQS in any Air Quality Control Area that is in attainment with that NAAQS;

    iii.  causes or contributes to violation of a PSD increment; or

    iv.   causes or contributes to any adverse impact on any formally recognized air quality and related values in any Class I area.

- 49 -

d.      The introduction of any new or changed NAAQS shall not, standing alone, provide the showing needed under subparagraph (c) of this Paragraph to pursue any claim for a modification at an Other Unit resolved under Subsection A of this Section.

## XIII.  PERIODIC REPORTING

126)     Pursuant to Paragraph 93 of this Consent Decree, NIPSCO shall conduct performance tests for PM that demonstrate compliance with the PM Emission Rate required by this Consent Decree with respect to NIPSCO System Units.  Within forty-five (45) days of each such performance test, NIPSCO shall submit the results of the performance test to EPA and IDEM at the address specified in Section XXI (Notices) of this Consent Decree.

127)     Beginning thirty (30) days after the end of the second calendar quarter following the Date of Entry of this Consent Decree, and continuing on a semi-annual basis until termination of this Consent Decree, and in addition to any other express reporting requirement in this Consent Decree, NIPSCO shall submit to EPA a progress report containing the following information:

a.      all information necessary to determine compliance with the requirements of the following Tables of this Consent Decree:  Tables 1, 2, 3 and 4 concerning $NO_X$ emissions; Tables 5 and 6 concerning $SO_2$ emissions (including information related to burning of low sulfur coal at Bailly Units 7 and 8); and Table 7 concerning PM emissions;

- 50 -

b.      documentation of any Capital Expenditures at a Unit's Boiler Island made during the period covered by the progress report and cumulative Boiler Island Capital Expenditures to date;

c.      all information relating to emission allowances and credits that NIPSCO claims to have generated in accordance with Paragraphs 70 and 85, through compliance beyond the requirements of this Consent Decree;

d.      all information indicating the status of installation and commencement of operation of pollution controls, including information that the installation and commencement of operation of a pollution control device may be delayed, including the nature and cause of the delay, and any steps taken by NIPSCO to mitigate such delay;

e.      all affirmative defenses asserted by NIPSCO pursuant to Section XVII (Affirmative Defense) for that quarter;

f.      all information relating to excess emissions due to startup, shutdown, and Malfunction emissions, including steps taken to minimize the adverse effects of such excess emissions; and

g.      information verifying compliance with:

        i.      Continuous Operation of all pollution control equipment,

        ii.      allowance Surrender requirements, including supporting calculations, and

        iii.      optimization of any ESP's, including any periods during which all sections were not in service, the reasons therefore and actions taken to remedy such failure.

128)     In any periodic progress report submitted pursuant to this Section, NIPSCO may incorporate by reference information previously submitted under its Title V permitting requirements, provided that NIPSCO attaches the Title V permit report, or the relevant portion thereof, and provides a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic progress report.

129)     In addition to the progress reports required pursuant to this Section, NIPSCO shall provide a written report to EPA of any violation of the requirements of this Consent Decree within fifteen (15) calendar days of when NIPSCO knew or should have known of any such violation.  In this report, NIPSCO shall explain the cause or causes of the violation and all measures taken or to be taken by NIPSCO to prevent such violations in the future.

130)     Each NIPSCO report shall be signed by NIPSCO's Vice President of Generation  or his or her equivalent or designee of at least the rank of Vice President, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my evaluation, or the directions  and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete.  I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

131)     If any Allowances are Surrendered to any third party pursuant to this Consent Decree, the third party's certification pursuant to Paragraphs 72 and 87, shall be signed by a managing officer of the third party and shall contain the following language:

> I certify under penalty of law that,_____ [name of third party] will not sell, trade, or otherwise exchange any of the allowances and will not use any of the allowances to meet any obligation imposed by any environmental law.  I

understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

## XIV.   REVIEW AND APPROVAL OF SUBMITTALS

132)     Unless otherwise provided, NIPSCO shall submit each plan, report, or other submission required by this Consent Decree to Plaintiffs whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree. Plaintiffs may approve the submittal or decline to approve it and provide written comments explaining the bases for declining such approval.  Within sixty (60) days of receiving written comments from Plaintiffs, NIPSCO shall either:  (a) revise the submittal consistent with the written comments and provide the revised submittal to Plaintiffs; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XVIII (Dispute Resolution) of this Consent Decree.

133)     Upon receipt of EPA's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, NIPSCO shall implement the approved submittal in accordance with the schedule specified therein or another EPA-approved schedule.

## XV.   STIPULATED PENALTIES

134)     For any failure by NIPSCO to comply with the terms of this Consent Decree, and subject to the provisions of Sections XVI (Force Majeure), VXII (Affirmative Defenses) and XVIII (Dispute Resolution), NIPSCO shall pay, within thirty (30) days after receipt of written demand to NIPSCO by the United States, the following stipulated penalties to the United States:

Table 8

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| a.  Failure to pay the civil penalty as specified in Section XI (Civil Penalty) of this Consent Decree. | $10,000 per day |
| b.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ or NOx, where the violation is less than 5% in excess of the limits set forth in this Consent Decree. | $2,500 per day per violation |
| c.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ or NOx, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree. | $5,000 per day per violation |
| d.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ or NOx, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree. | $10,000 per day per violation |
| e.  Failure to comply with any applicable average Removal Efficiency for SO2 where the violation is equal to or less than 0.15% less than the applicable limit. | $2,500 per day per violation |
| f.  Failure to comply with any applicable average Removal Efficiency for SO2 where the violation is greater than 0.15% but less than 0.3% less than the applicable limit. | $5,000 per day per violation |
| g.  Failure to comply with any applicable average Removal Efficiency for SO2 where the violation is equal to or greater than 0.3% less than the applicable limit. | $10,000 per day per violation |
| h.  Failure to comply with any applicable 365-Day Rolling Average Emission Rate for NOx, where the violation is less than 5% in excess of the limits set forth in this Consent Decree. | $350 per day of violation for a 365-Day Rolling Average Emission Rate violation, plus $4,000 for each subsequent 365-Day Rolling Average Emission Rate violation that includes any day in a previously assessed 365-Day Rolling Average Emission Rate violation (*e.g.*, if a violation of the 365-Day Rolling Average |

- 54 -

| | |
|---|---|
| | Emission Rate for a Unit first occurs on June 1, 2010, occurs again on June 2, 2010, and again on May 31, 2011, the total stipulated penalty assessed for these three violations would equal $135,750). |
| i. Failure to comply with any applicable 365-Day Rolling Average Emission Rate for NOx, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree. | $450 per day of violation for a 365-Day Rolling Average Emission Rate violation, plus $5,000 for each subsequent 365-Day Rolling Average Emission Rate violation that includes any day in a previously assessed 365-Day Rolling Average Emission Rate violation (*e.g.*, if a violation of the 365-Day Rolling Average Emission Rate for a Unit first occurs on June 1, 2010, occurs again on June 2, 2010, and again on May 31, 2011, the total stipulated penalty assessed for these three violations would equal $174,250). |
| j. Failure to comply with any applicable 365-Day Rolling Average Emission Rate for NOx, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree. | $600 per day of violation for a 365-Day Rolling Average Emission Rate violation, plus $6,000 for each subsequent 365-Day Rolling Average Emission Rate violation that includes any day in a previously assessed 365-Day Rolling Average Emission Rate violation (*e.g.*, if a violation of the 365-Day Rolling Average Emission Rate for a Unit first occurs on June 1, 2010, occurs again on June 2, 2010, and again on May 31, 2011, the total stipulated penalty assessed for these three violations would equal $231,000). |
| k.  Failure to comply with the Annual Tonnage Limits | $5,000 per ton for the first 1000 tons, and $10,000 per ton for each |

- 55 -

| | |
|---|---|
| for $SO_2$. | additional ton above 1000 tons.  In addition, NIPSCO shall Surrender, pursuant to the procedures set forth in Paragraph 86, $SO_2$ Allowances in an amount equal to two times the number of tons by which the limitation was exceeded |
| l.  Failure to comply with the Annual Tonnage Limits for $NO_X$. | $5,000 per ton for the first 1000 tons, and $10,000 per ton for each additional ton above 1000 tons.  In addition, NIPSCO shall Surrender, pursuant to the procedures set forth in Paragraph 71, $NO_x$ Allowances in an amount equal to two times the number of tons by which the limitation was exceeded. |
| m.  Operation of a Unit required under this Consent Decree to be equipped with any $NO_X$, $SO_2$, or PM control device without the operation of such device,  to the extent operation of that control device is  required under this Consent Decree. | $10,000 per day per violation during the first 30 days, $27,500 per day per violation thereafter |
| n.  Failure to install or operate CEMS as required in this Consent Decree. | $1,000 per day per violation |
| o.  Failure to conduct performance tests of PM emissions, as required in this Consent Decree. | $1,000 per day per violation |
| p.  Failure to apply for any permit, or amendment or application therefor, required by Section XIX (Permits and SIP Revisions). | $1,000 per day per violation |
| q.  Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree. | $750 per day per violation during the first ten days, $1,000 per day per violation thereafter |
| r.  Selling or trading $NO_X$ Allowances except as permitted by Section IV. D (Use and Surrender of NOx Allowances). | The surrender of $NO_X$ Allowances in an amount equal to four times the number of $NO_X$ Allowances used, sold, or transferred in violation of this Consent Decree |
| s.  Selling or trading $SO_2$ Allowances except as permitted | The surrender of $SO_2$ Allowances |

| | |
|---|---|
| by Section V.D (Use and Surrender of $SO_2$ Allowances). | in an amount equal to four times the number of $SO_2$ Allowances used, sold, or transferred in violation of this Consent Decree |
| t.  Failure to Surrender NOx Allowances as required by Paragraph 71. | (a) $27,500 per day plus (b) $1,000 per NOx Allowance not surrendered |
| u.  Failure to Surrender $SO_2$ Allowances as required by Paragraph 86. | (a) $27,500 per day plus (b) $1,000 per $SO_2$ Allowance not surrendered |
| v. Failure to demonstrate the third-party Surrender of an NOx Allowance in accordance with Paragraphs 72 and 73. | $2,500 per day per violation |
| w.  Failure to demonstrate the third-party surrender of an $SO_2$ Allowance in accordance with Paragraphs 87 and 88. | $2,500 per day per violation |
| x.  Failure to undertake and complete any of the Environmental Mitigation Projects in compliance with Section X (Environmental Mitigation Projects) of this Consent Decree. | $1,000 per day per violation during the first 30 days, $5,000 per day per violation thereafter |
| y. Failure to notify EPA of its decision to adopt any NOx or SO2 Option pursuant to Tables 1 and 5. | $1,000 per day per violation |
| z.  Violating an applicable PM Emission Rate based on the results of a stack test required pursuant to Paragraph 94 of this Consent Decree, where the violation is less than 5% in excess of the limit set forth in this Consent Decree. | $2,500 per day, starting on the day a stack test result demonstrates a violation and continuing each day thereafter until and excluding such day on which a subsequent stack test* demonstrates compliance with the applicable PM Emission Rate |
| aa. Violating an applicable PM Emission Rate based on the results of a stack test required pursuant to Paragraph 94 of this Consent Decree, where the violation is equal to or greater than 5% but less than 10% in excess of the limit set forth in this Consent Decree. | $5,000 per day, starting on the day a stack test result demonstrates a violation and continuing each day thereafter until and excluding such day on which a subsequent stack test* demonstrates compliance with the applicable PM Emission |

- 57 -

| | Rate |
|---|---|
| bb. Violating an applicable PM Emission Rate based on the results of a stack test required pursuant to Paragraph 94 of this Consent Decree, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree. | $10,000 per day, starting on the day a stack test result demonstrates a violation and continuing each day thereafter until and excluding such day on which a subsequent stack test* demonstrates compliance with the applicable PM Emission Rate |
| cc.  Failure to optimize ESP or Baghouse pursuant to Paragraph 91. | $2,500 per day |
| dd.  Any other violation of this Consent Decree | $1,000 per day per violation |

*NIPSCO shall not be required to make any submission, including any notice or test protocol, or to obtain any approval to or from EPA or IDEM in advance of conducting such a subsequent stack test.

135)    Violations of any limit based on a 30-Day Rolling Average constitute thirty (30) days of violation, but where such a violation (for the same pollutant and from the same Unit) recurs within periods less than thirty (30) Operating Days, NIPSCO shall not be obligated to pay a daily stipulated penalty for any day of the recurrence for which a stipulated penalty has already been paid.

136)    Violations of any limit based on a 365-Day Rolling Average constitute 365 days of violation, but where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 365 Operating Days, NIPSCO shall not be obligated to pay a daily stipulated penalty for any day of the recurrence for which a stipulated penalty has already been paid.

137)    A violation of the Monthly $SO_2$ Removal Efficiency for a given Calendar Month shall constitute a violation on each day within the Month.  For clarity, if NIPSCO Surrenders $SO_2$ allowances pursuant to Paragraph 79 of this Consent Decree as a means to

comply with the Monthly SO$_2$ Removal Efficiency requirement, there is no Monthly SO$_2$ Removal Efficiency violation.

138)    All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable.  Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

139)    NIPSCO shall pay all stipulated penalties to the United States within thirty (30) days of receipt of written demand to NIPSCO from the United States, and shall continue to make such payments every thirty (30) days thereafter until the violation(s) no longer continues, unless NIPSCO elects within twenty (20) days of receipt of written demand to NIPSCO from the United States to dispute the obligation to pay or the accrual of stipulated penalties in accordance with the provisions in Section XVIII (Dispute Resolution) of this Consent Decree.

140)    Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 134 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.    If the dispute is resolved by agreement, or by a decision of Plaintiffs pursuant to Section XVIII (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid

within thirty (30) days of the effective date of the agreement or of the receipt of Plaintiffs' decision;

b.      If the dispute is appealed to the Court and Plaintiffs prevail in whole or in part, NIPSCO shall, within sixty (60) days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in subparagraph (c) of this Paragraph; or

c.      If the Court's decision is appealed by any Party, NIPSCO shall, within fifteen (15) days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with interest accrued on such stipulated penalties determined to be owing by the appellate court.

Notwithstanding any other provision of this Consent Decree, the accrued stipulated penalties agreed by Plaintiffs and NIPSCO, or determined by Plaintiffs through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 134.

141)     All stipulated penalties shall be paid in the manner set forth in Section XI (Civil Penalty) of this Consent Decree.

142)     Should NIPSCO fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

143)   The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State of Indiana by reason of NIPSCO's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of this Consent Decree (for which this Consent Decree provides for payment of a stipulated penalty) that is also a violation of the Act, including the implementing Title V operating permit program, regulations EPA has approved and/or promulgated under the Act, the Indiana SIP, including Indiana regulations under 326 IAC Article 2, or of an operable Title V permit, NIPSCO shall be allowed a credit for stipulated penalties paid against any statutory or regulatory penalties also imposed for such violation.

## XVI. **FORCE MAJEURE**

144)   For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of NIPSCO, its contractors, or any entity controlled by NIPSCO that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite NIPSCO's best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event: (a) as it is occurring; and (b) after it has occurred, such that the delay and violation are minimized to the greatest extent possible and the emissions during such event are minimized to the greatest extent possible. Specific references to Force Majeure in other parts of this Consent Decree do not restrict the ability of NIPSCO to assert Force Majeure pursuant to the process described in this section. .

145)   <u>Notice of Force Majeure Events</u>.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which NIPSCO intends to assert a claim of Force Majeure, NIPSCO shall notify Plaintiffs in writing as soon as practicable, but in no event later than fourteen (14) business days following the date NIPSCO first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation. In this notice, NIPSCO shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by NIPSCO to prevent or minimize the delay or violation, the schedule by which NIPSCO proposes to implement those measures, and NIPSCO's rationale for attributing a delay or violation to a Force Majeure Event.  A copy of this notice shall be sent electronically, as soon as practicable, to the U.S. Department of Justice, EPA, and IDEM.  NIPSCO shall adopt all reasonable measures to avoid or minimize such delays or violations and any resulting emissions.  NIPSCO shall be deemed to know of any circumstance which NIPSCO, its contractors, or any entity controlled by NIPSCO knew or should have known.

146)   <u>Failure to Give Notice</u>.  If NIPSCO fails to comply with the notice requirements of this Section, EPA may void NIPSCO's claim for Force Majeure as to the specific event for which NIPSCO has failed to comply with such notice requirement.

147)   <u>EPA's Response</u>.  EPA shall notify NIPSCO in writing regarding NIPSCO's claim of Force Majeure within twenty (20) business days of receipt of the notice provided under Paragraph 144.  If EPA agrees that a delay in performance has been or will be caused by a Force Majeure Event, EPA and NIPSCO shall stipulate to an extension of

- 62 -

deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event. In such circumstances, an appropriate modification shall be made pursuant to Section XXV (Modification) of this Consent Decree.

148)    Disagreement. If EPA does not accept NIPSCO's claim of Force Majeure, or if EPA and NIPSCO cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XVIII (Dispute Resolution) of this Consent Decree.

149)    Burden of Proof. In any dispute regarding Force Majeure, NIPSCO shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event. NIPSCO shall also bear the burden of proving that NIPSCO gave the notice required by this Section and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event. An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

150)    Events Excluded. Unanticipated or increased costs or expenses associated with the performance of NIPSCO's obligations under this Consent Decree shall not constitute a Force Majeure Event.

151)    Potential Force Majeure Events. The Parties agree that, depending upon the circumstances related to an event and NIPSCO's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; failure of PureAir to agree to modify any contract regarding the operation of the FGD on Bailly Units

- 63 -

7 or 8; Malfunction of a Unit or emission control device; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization, acting under and authorized by applicable law, that directs NIPSCO to supply electricity in response to a system-wide (statewide or regional) emergency or to shut down a Unit or Units.  Depending upon the circumstances and NIPSCO's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of NIPSCO and NIPSCO has taken all steps available to it to obtain the necessary permit, including, but not limited to:  submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

152)     As part of the resolution of any matter submitted to this Court under Section XVIII (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, Plaintiff and NIPSCO by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States or approved by the Court.  NIPSCO shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule (provided that NIPSCO shall not be precluded from making a further claim of Force Majeure with regard to meeting any such extended or modified schedule).

- 64 -

## XVII.  **AFFIRMATIVE DEFENSES**

153)   Affirmative defense as to stipulated penalties for excess emissions occurring during Malfunctions.  If any of NIPSCO's Units exceeds a unit-specific 30-Day Rolling Average Emission Rate, 30-Day Rolling Average Removal Efficiency, or Monthly $SO_2$ Removal Efficiency due to a Malfunction, NIPSCO, bearing the burden of proof, has an affirmative defense to stipulated penalties under this Consent Decree if NIPSCO complies with the reporting requirements of Paragraphs 156, and demonstrates all of the following:

   a.   the excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond NIPSCO's control;

   b.   the excess emissions did not stem from any activity or event that could have been foreseen and avoided, or planned for, and could not have been avoided by better operation and maintenance practices;

   c.   to the maximum extent practicable, the air pollution control equipment and processes were maintained and operated in a manner consistent with good practice for minimizing emissions;

   d.   repairs were made in an expeditious fashion when NIPSCO knew or should have known that the applicable 30-Day Rolling Average Emission Rate, 30-Day Rolling Average Removal Efficiency or Monthly $SO_2$ Removal Efficiency was being or would be exceeded.  Off-shift labor and overtime must have been utilized, to the greatest extent practicable, to ensure that such repairs were made as expeditiously as practicable;

e.  the amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

f.  all possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

g.  all emission monitoring systems were kept in operation if at all possible;

h.  NIPSCO's actions in response to the excess emissions were documented by properly signed, contemporaneous operating logs, or other relevant evidence;

i.  the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance; and

j.  NIPSCO properly and promptly notified EPA as required by this Consent Decree.

154)  <u>Affirmative Defenses as to stipulated penalties for excess emissions occurring during startup or shutdown</u>.  If any of NIPSCO's Units exceed a unit-specific 30-Day or 365-Day Rolling Average Emission Rate, 30-Day Rolling Average Removal Efficiency, or Monthly SO2 Removal Efficiency due to startup or shutdown, NIPSCO, bearing the burden of proof, has an affirmative defense to stipulated penalties under this Consent Decree if NIPSCO complies with the reporting requirements of Paragraphs 156, and demonstrates all of the following:

a.  The periods of excess emissions that occurred during startup and shutdown were short and infrequent and could not have been prevented through careful and prudent planning and design;

b.    The excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance;

c.    If the emissions were caused by a bypass (an intentional diversion of control equipment), then the bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

d.    At all times, the facility was operated in a manner consistent with good practice for minimizing emissions;

e.    The frequency and duration of operation in startup or shutdown mode was minimized to the maximum extent practicable;

f.    All possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

g.    All emission monitoring systems were kept in operation if at all possible;

h.    NIPSCO's actions during the period of excess emissions were documented by properly signed, contemporaneous operating logs, or other relevant evidence; and

i.    NIPSCO properly and promptly notified EPA as required by this Consent Decree.

155)    If excess emissions occur due to a Malfunction during startup and/or shutdown, then those instances shall be treated as other Malfunctions subject to Paragraph 153.

156)    NIPSCO shall provide notice to the United States in writing of NIPSCO's intent to assert an affirmative defense as to stipulated penalties for Malfunction, startup, or shutdown in NIPSCO's semi-annual progress reports as required by Paragraph 127(e).

This notice shall be submitted to EPA pursuant to the provisions of Section XXI (Notices). The notice shall contain:

a.   The identity of each stack or other emission point where the excess emissions occurred;

b.   The magnitude of the excess emissions expressed in the units of the applicable emissions limitation and the operating data and calculations used in determining the magnitude of the excess emissions;

c.   The time and duration or expected duration of the excess emissions;

d.   The identity of the equipment from which the excess emissions emanated;

e.   The nature and cause of the emissions;

f.   The steps taken, if the excess emissions were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunctions;

g.   The steps that were or are being taken to limit the excess emissions; and

h.   If NIPSCO's permit contains procedures governing source operation during periods of startup, shutdown, or Malfunction and the excess emissions resulted from startup, shutdown, or Malfunction, a list of the steps taken to comply with the permit procedures.

157)   A Malfunction, startup, or shutdown shall not constitute a Force Majeure Event unless the Malfunction, startup, or shutdown also meets the definition of a Force Majeure Event, as provided in Section XVI (Force Majeure).

## XVIII. <u>DISPUTE RESOLUTION</u>

158)    The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

159)    The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section. The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) days following receipt of such notice.

160)    Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the disputing Parties.  Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting among the disputing Parties' representatives unless they agree in writing to shorten or extend this period.  During the informal negotiations period, the disputing Parties may also submit their dispute to a mutually agreed upon alternative dispute resolution ("ADR") forum if the Parties agree that the ADR activities can be completed within the 30-day informal negotiations period (or such longer period as the Parties may agree to in writing).

161)    If the disputing Parties are unable to reach agreement during the informal negotiation period, Plaintiffs shall provide NIPSCO with a written summary of their

- 69 -

position regarding the dispute. The written position provided by Plaintiffs shall be considered binding unless, within forty-five (45) calendar days thereafter, NIPSCO seeks judicial resolution of the dispute by filing a petition with this Court. Plaintiffs may respond to the petition within forty-five (45) calendar days of filing. In their initial filings with the Court under this Paragraph, the disputing Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute. The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.

162)    The time periods set out in this Section may be shortened or lengthened upon motion to the Court of one of the Parties to the dispute, explaining the Party's basis for seeking such a scheduling modification.

163)    This Court shall not draw any inferences nor establish any presumptions adverse to any disputing Party as a result of invocation of this Section or the disputing Parties' inability to reach agreement.

164)    As part of the resolution of any dispute under this Section, in appropriate circumstances the disputing Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution. NIPSCO shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that NIPSCO shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

## XIX.   **PERMITS AND SIP REVISIONS**

165)    Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires NIPSCO to secure a permit to authorize construction or operation of any device contemplated herein, including all preconstruction, construction, and operating permits required under state law, NIPSCO shall make such application in a timely manner.  EPA and the State of Indiana shall use their best efforts to review expeditiously all permit applications submitted by NIPSCO to meet the requirements of this Consent Decree.

166)    Notwithstanding the previous paragraphs, nothing in this Consent Decree shall be construed to require NIPSCO to apply for, amend or obtain (1) a PSD or Nonattainment NSR permit or permit modification for any physical change in, or any change in the method of operation of, any NIPSCO System Unit that would give rise to claims resolved by Section XII (Resolution of Claims) of this Consent Decree; or (2) any Title V Permit or other operating permit or permit modification, or application therefore, related to or arising from any physical change in, or change in the method of operation of, any NIPSCO System Unit that would give rise to claims resolved by Section XII (Resolution of Claims) of this Consent Decree.

167)    When permits are required as described in Paragraph 165, NIPSCO shall complete and submit applications for such permits to the appropriate authorities to allow time for all legally required processing and review of the permit request, including requests for additional information by the permitting authorities.  Any failure by NIPSCO to submit a timely permit application for NIPSCO System Units shall bar any use by NIPSCO of

Section XVI (Force Majeure) of this Consent Decree, where a Force Majeure claim is
based on permitting delays.

168)    Notwithstanding the reference to Title V permits in this Consent Decree,
the enforcement of such permits shall be in accordance with their own terms and the Act.
The Title V permits shall not be enforceable under this Consent Decree, although any term
or limit established by or under this Consent Decree shall be enforceable under this
Consent Decree regardless of whether such term has or will become part of a Title V
permit, subject to the terms of Section XXIX (Conditional Termination of Enforcement
Under Decree) of this Consent Decree.

169)    Within one hundred and eighty (180) days after the Date of Entry of this
Consent Decree, NIPSCO shall amend any Title V permit application, or apply for
modifications to its Title V permits to include a schedule for implementation of all Annual
System Tonnage Limitations, as well as all Unit-specific performance, operational,
maintenance, and control technology requirements established by this Consent Decree
including, but not limited to, any required 30- or 365-Day Rolling Average Emission Rate
or Removal Efficiency and the requirements pertaining to the Surrender of Allowances.
Any modifications to the Title V permits or Title V permit applications pursuant to this
Paragraph shall include a provision that recognizes that any noncompliance with Annual
System Tonnage Limitation requirements constitutes a single violation for the NIPSCO
System as a whole and does not create separate violations for each Unit or each facility
within the NIPSCO System.

170)    Within one (1) year from the Date of Entry of this Consent Decree,
NIPSCO shall submit a written request that IDEM amend the Indiana SIP to incorporate all

- 72 -

of the following Consent Decree requirements: performance, operational, maintenance, and control technology requirements; emission rates; removal efficiencies; system-wide Annual Tonnage Limitations; allowance surrenders; limits on use of emission credits; and operation, maintenance and optimization requirements.  Such request shall include not only requirements related to particular Units in the NIPSCO System but also those related to the NIPSCO System as a whole.

171)    As soon as practicable, but in no event later than ninety (90) days after the Indiana SIP is amended to include the requirements set forth in Paragraph 170 above, NIPSCO shall file a complete application to IDEM to incorporate the requirements of the Indiana SIP, as amended, into the Title V operating permit for each Facility.   In making such an application, NIPSCO shall request that the Title V operating permit for each Facility: (i) refer to the section of the amended Indiana SIP that incorporates the system-wide requirements to comply with the Annual System Tonnage Limitation for NOx in Table 4, and the Annual System Tonnage Limitation for $SO_2$ in Table 6; and (ii) include a provision that recognizes that any noncompliance with any Annual System Tonnage Limitation constitutes a single violation for the NIPSCO System as a whole and does not create separate violations for each Unit or each facility within the NIPSCO System.  The requirement to comply with the system-wide Annual System Tonnage Limitations for NOx and $SO_2$ shall continue to apply after the termination of the Consent Decree.

172)    NIPSCO shall provide Plaintiffs with a copy of its request for SIP amendment  (as required in Paragraph 170, above) and its applications for Title V Permit modifications  (as required in Paragraph 169 and 171, above), as well as a copy of any

permit proposed as a result of such application, to allow for timely participation in any

public comment opportunity.

173)    If NIPSCO sells or transfers to an entity unrelated to NIPSCO ("Third

Party Purchaser") part or all of its Ownership Interest in the NIPSCO System or individual

Units, NIPSCO shall comply with the requirements of Section XXII (Sales or Transfers of

Ownership Interests) with regard to such Unit or Units prior to any such sale or transfer

unless, following any such sale or transfer, NIPSCO remains the holder of the federally

enforceable permit for such facility.

## XX.   INFORMATION COLLECTION AND RETENTION

174)    Any authorized representative of the United States, including its attorneys,

contractors, and consultants, upon presentation of credentials, shall have a right of entry

upon the premises of any facility in the NIPSCO System at any reasonable time for the

purpose of:

    a.    monitoring the progress of activities required under this Consent Decree;

    b.    verifying any data or information submitted to the United States in

        accordance with the terms of this Consent Decree;

    c.    obtaining samples and, upon request, splits of any samples taken by

        NIPSCO or its representatives, contractors, or consultants; and

    d.    assessing NIPSCO's compliance with this Consent Decree.

175)    NIPSCO shall retain, and instruct its contractors and agents to preserve, all

non-identical copies of all records and documents (including records and documents in

electronic form) now in its or its contractors' or agents' possession or control, and that

directly relate to NIPSCO's performance of its obligations under this Consent Decree for

the following periods:  (a) until December 31, 2023, for records concerning physical or

operational modifications that are subject to reopener provisions of Section XII, Subsection

B of this Consent Decree; and (b) until December 31, 2019, for all other records.  This

record retention requirement shall apply regardless of any corporate document retention

policy to the contrary.

      176)     All information and documents submitted by NIPSCO pursuant to this

Consent Decree shall be subject to any requests under applicable law providing public

disclosure of documents unless:  (a) the information and documents are subject to legal

privileges or protection; or (b) NIPSCO claims and substantiates in accordance with 40

C.F.R. Part 2 that the information and documents contain confidential business

information.

      177)     Nothing in this Consent Decree shall limit the authority of the EPA to

conduct tests and inspections at NIPSCO's facilities under section 114 of the Act, 42

U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

## XXI.  NOTICES

      178)     Unless otherwise provided herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

As to the United States Department of Justice:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
DJ# 90-5-2-1-08417

<u>As to EPA</u>:

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

and

George Czerniak
Chief, Air Enforcement and Compliance Assurance Branch
EPA Region 5 (AE-17J)
77 West Jackson St.
Chicago, IL 60604


<u>As to the State of Indiana:</u>

Phil Perry
Indiana Department of Environmental Management
Chief, Air Compliance Branch
100 North Senate Avenue
MC-61-53, IGCN 1003
Indianapolis, IN 46204-2251

<u>As to the Northern Indiana Public Service Company</u>:

Vice President, Operations
NIPSCO
801 East 86th Ave.
Merrillville, IN 46410

and

Chief Legal Officer
NiSource, Inc.
801 East 86th Ave.
Merrillville, IN 46410

179)     All notifications, communications or submissions made pursuant to this Section shall be sent either by:  (a) overnight mail or overnight delivery service; or (b) certified or registered mail, return receipt requested.  All notifications, communications and transmissions sent by overnight, certified or registered mail shall be deemed submitted on the date they are postmarked.  If sent by overnight delivery service, they shall be deemed submitted on the date they are delivered to the delivery service.

180)     Any Party may change the notice recipient, the address for providing notices or the means of transmittal to it by serving the other Party with a notice setting forth such new notice recipient, such new address or such changed means of transmittal (e.g., to electronic format).

## XXII.  SALES OR TRANSFERS OF OWNERSHIP INTERESTS

181)     If NIPSCO proposes to sell or transfer any Ownership Interest in any System Unit to an entity unrelated to NIPSCO ("Third Party Purchaser"), it shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to Plaintiffs pursuant to Section XXI (Notices) of this Consent Decree at least sixty (60) days before such proposed sale or transfer.

182)     No sale or transfer of an Ownership Interest shall take place before the Third Party Purchaser and EPA have executed, and the Court has approved, a modification pursuant to Section XXV (Modification) of this Consent Decree making the Third Party Purchaser a party to this Consent Decree and jointly and severally liable with NIPSCO for all the requirements of this Decree that may be applicable to the transferred or purchased Ownership Interests.

183)     This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between NIPSCO and any Third Party Purchaser so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation as between NIPSCO and any Third Party Purchaser of Ownership Interests of the burdens of compliance with this Decree, provided that both NIPSCO and such Third Party Purchaser shall remain jointly and severally liable to EPA for the obligations of the Decree applicable to the transferred or purchased Ownership Interests.

184)     If EPA agrees, EPA, NIPSCO, and the Third Party Purchaser that has become a party to this Consent Decree, pursuant to Paragraph 182, may execute a modification that relieves NIPSCO of its liability under this Consent Decree for, and makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Ownership Interests.  Notwithstanding the foregoing, however, NIPSCO may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Ownership Interests, including the obligations set forth in Sections X (Environmental Mitigation Projects) and XI (Civil Penalty).  NIPSCO may propose and EPA may agree to restrict the scope of the joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Ownership Interests, to the extent such obligations may be adequately separated in an enforceable manner.

185)     Paragraphs 182 and 184 of this Consent Decree does not apply if an Ownership Interest is sold or transferred solely as collateral security in order to consummate a financing arrangement (not including a sale-leaseback), so long as NIPSCO:

(a) remains the operator (as that term is used and interpreted under the Clean Air Act) of

the NIPSCO System Units; (b) remains subject to and liable for all obligations and

liabilities of this Consent Decree; and (c) supplies Plaintiffs with the following certification

within 30 days of the sale or transfer:

> Certification of Change in Ownership Interest Solely for Purpose of
> Consummating Financing. We, the Chief Executive Officer and General Counsel
> of the Northern Indiana Public Service Co., jointly certify under Title 18 U.S.C.
> section 1001, on our own behalf and on behalf of Northern Indiana Public Service
> Co. ("NIPSCO"), that any change in NIPSCO's Ownership Interest in any Unit
> that is caused by the sale or transfer as collateral security of such Ownership
> Interest in such Unit(s) pursuant to the financing agreement consummated on
> [insert applicable date] between NIPSCO and [insert applicable entity]:  (a) is
> made solely for the purpose of providing collateral security in order to
> consummate a financing arrangement; (b) does not impair NIPSCO's ability,
> legally or otherwise, to comply timely with all terms and provisions of the
> Consent Decree entered in *United States of America  v. Northern Indiana Public
> Service Co..*, Civil Action No. _____;  c) does not affect NIPSCO's
> operational control of any Unit covered by that Consent Decree in a manner that
> is inconsistent with NIPSCO's performance of its obligations under the Consent
> Decree; and d) in no way affects the status of NIPSCO's obligations or liabilities
> under that Consent Decree.

## XXIII. EFFECTIVE DATE

186)     The effective date of this Consent Decree shall be the Date of Entry as

defined by Paragraph 19.  If this Consent Decree is not entered by the Court in the form

presented to the Court or the United States or the State of Indiana withhold consent to this

Consent Decree before filing, its terms shall be null and void and the Parties shall have no

obligation or rights hereunder and the terms of this Consent Decree shall not be used as

evidence in any litigation between or among the parties to the Consent Decree.

## XXIV. RETENTION OF JURISDICTION

187)     The Court shall retain jurisdiction of this case after entry of this Consent

Decree to enforce compliance with the terms and conditions of this Consent Decree and to

take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXV.  **MODIFICATION**

188)     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Plaintiffs and NIPSCO.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XXVI. **GENERAL PROVISIONS**

189)     This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  The emission rates set forth herein do not relieve Defendant from any obligation to comply with other state and federal requirements under the Clean Air Act, including Defendant's obligation to satisfy any state modeling requirements set forth in the Indiana State Implementation Plan.

190)     This Consent Decree does not apply to any claim(s) of alleged criminal liability.

191)     In any subsequent administrative or judicial action initiated by Plaintiffs for injunctive relief or civil penalties relating to the facilities covered by this Consent Decree, Defendant shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by Plaintiffs in the

- 80 -

subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to affect the validity of Section XII (Resolution of Claims).

192)     Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve Defendant of its obligation to comply with all applicable federal, state, and local laws and regulations.  Subject to the provisions in Sections XII (Resolution of Claims), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

193)     Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree and, except as otherwise provided in this Consent Decree, every other term used in this Consent Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Consent Decree what such term means under the Act or those implementing regulations.

194)     Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 40 C.F.R. § 52.12(c) (62 Fed. Reg. 8314; Feb. 24, 1997)) concerning the use of data for any purpose under the Act.

195)     Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

196)     Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed.  For example, an Emission Rate of 0.070

lb/mmBTU is not met if the actual Emission Rate is 0.071 lb/mmBTU.  NIPSCO shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits.  For example, if an actual Emission Rate is 0.0704, that shall be reported as 0.070, and shall be in compliance with an Emission Rate of 0.070, and if an actual Emission Rate is 0.0705, that shall be reported as 0.071, and shall not be in compliance with an Emission Rate of 0.070.  NIPSCO shall report data to the number of significant digits in which the standard or limit is expressed.

197)    This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against any third parties.

198)    This Consent Decree constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supercedes all prior agreements and understandings among the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

199)    Each Party to this action shall bear its own costs and attorneys' fees.

200)    The Parties expressly recognize that whenever this Consent Decree specifies that a 30- Day Rolling Average Emission Rate or a 30-Day Rolling Average Removal Efficiency shall be achieved and/or maintained commencing or starting by or no later than a certain day or date, then compliance with such Rate or Removal Efficiency shall commence immediately upon the date specified, and that compliance as of such

specified date (e.g. December 30) shall be determined based on data from that date and the 29 prior Unit Operating Days (e.g. December 1-29).

201)     The Parties expressly recognize that whenever this Consent Decree specifies that a Monthly $SO_2$ Removal Efficiency shall be achieved and/or maintained at Bailly commencing or starting by or no later than a certain month, then that certain month shall be the first month included in the specified Monthly $SO_2$ Removal Efficiency (e.g., where the Decree specifies that a 95% Monthly $SO_2$ Removal Efficiency is to be achieved and maintained no later than January 2011, then January 2011 shall be the first month included in the first Monthly $SO_2$ Removal Efficiency period, and no day or month prior to January 2011 shall be subject to the Monthly $SO_2$ Removal Efficiency requirement or included in any calculation to determine compliance with such removal efficiency).

202)     The Parties expressly recognize that whenever this Consent Decree specifies that a 365-Day Rolling Average Emission Rate shall be achieved and/or maintained commencing or starting by, on, or no later than a certain day or date, then that certain day or date, if it is an Operating Day, or if it is not an Operating Day then the first Operating Day thereafter, shall be the first day subject to that specified 365-Day Rolling Average Emission Rate (e.g., if the specified 365-Day Rolling Average Emission Rate is to be achieved and maintained from January 1, 2014 through December 31, 2014, and January 1, 2014 is an Operating Day, then January 1, 2014 shall be the first day included in the first 365-Day Rolling Average Emission Rate period, and no day prior to January 1, 2014 shall be subject to that specified 365-Day Rolling Average Emission Rate requirement or included in any calculation to determine compliance with such rate).

- 83 -

XXVII.        **SIGNATORIES AND SERVICE**

203)      Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

204)      This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

205)      Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

206)      Unless otherwise ordered by the Court, the Plaintiffs agree that the Defendant will not be required to file any answer or other pleading responsive to the Complaint in this matter until and unless the Court expressly declines to enter this Consent Decree, in which case Defendant shall have no less than thirty (30) days after receiving notice of such express declination to file an answer or other pleading in response to the Complaint.

XXVIII.        **PUBLIC COMMENT**

207)      The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper or inadequate.  Defendant shall not oppose entry of this

Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States or the State of Indiana has notified Defendant, in writing, that the United States or the State of Indiana no longer supports entry of the Consent Decree.

## XXIX. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER DECREE

208)   Termination as to Completed Tasks.  As soon as NIPSCO completes a construction project or any other requirement of this Consent Decree that is not ongoing or recurring, NIPSCO may, by motion to this Court, seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

209)   Conditional Termination of Enforcement Through the Consent Decree. After NIPSCO:

a.   has successfully completed construction, and has maintained operation, of all pollution controls as required by this Consent Decree;

b.   has obtained final permits and SIP revisions that incorporate the requirements of this Consent Decree, as enforceable permit terms or enforceable SIP terms, of all of the Unit performance and other requirements specified in Section XIX (Permits and SIP Revisions) of this Consent Decree; and

c.   certifies that the date is later than December 31, 2018, then NIPSCO may so certify these facts to Plaintiffs and this Court.  If Plaintiffs do not object in writing with specific reasons within forty-five (45) days of receipt of NIPSCO's certification, then, for any Consent Decree violations that occur after the filing of notice, Plaintiffs shall pursue enforcement of the requirements contained in the Indiana SIP and Title V permit through the

Indiana SIP and applicable Title V permit, and not through this Consent Decree.

210)   <u>Resort to Enforcement Under this Consent Decree</u>.  Notwithstanding Paragraph 209 above, if enforcement of a provision in this Consent Decree cannot be pursued by a party under the Indiana SIP or applicable Title V permit, or if a Consent Decree requirement was intended to be part of the Indiana SIP or the applicable Title V Permit and did not become or remain part of such SIP or permit, then such requirement may be enforced under the terms of this Consent Decree at any time.

## XXX.  FINAL JUDGMENT

211)   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment among Plaintiffs and NIPSCO.

**SO ORDERED, THIS** __22__ **DAY OF** _____July_____, **20**__11__.

s/ Joseph S. Van Bokkelen
_____

HONORABLE  Joseph S. Van Bokkelen

UNITED STATES DISTRICT COURT JUDGE

**Signature Page for Consent Decree in:**

*United States of America*
*v.*
*Northern Indiana Public Service Co.*

**FOR THE UNITED STATES OF AMERICA:**

Ignacia S. Moreno
Assistant Attorney General
Environmental and Natural Resources Division
United States Department of Justice

Jerome W. MacLaughlin
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: 202-616-7162
Facsimile: 202-616-2427
Email: jerry.maclaughlin@usdoj.gov

–87–

**Signature Page for Consent Decree in:**

*United States of America*
*v.*
*Northern Indiana Public Service Co.*

**FOR THE UNITED STATES OF AMERICA:**

David Capp
United States Attorney
Northern District of Indiana

Wayne T. Ault
Assistant United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana  46320
Phone: 219-937-5500
Facsimile: 219-937-5547
Email: wayne.ault@usdoj.gov

–88–

**Signature Page for Consent Decree in:**

*United States of America*
*v.*
*Northern Indiana Public Service Co.*

**FOR THE UNITED STATES OF AMERICA:**

_Cynthia Giles_ 1/6/11

Cynthia Giles
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

_Phillip A. Brooks_ 12/20/10

Phillip A. Brooks
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

_Seema Kakade_

Seema Kakade
Attorney Advisor, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

–89–

Signature Page for Consent Decree in:

*United States of America*
*v.*
*Northern Indiana Public Service Co.*

**FOR THE UNITED STATES OF AMERICA:**

_____

Susan Hedman
Regional Administrator
United States Environmental Protection Agency Region 5

_____

Robert A. Kaplan
Regional Counsel
United Stated Environmental Protection Agency Region 5

_____

Louise C. Gross
Associate Regional Counsel
United States Environmental Protection Agency Region 5

–90–

**Signature Page for Consent Decree in:**

*United States of America*
*v.*
*Northern Indiana Public Service Co.*

**FOR THE STATE OF INDIANA:**

FOR THE STATE OF INDIANA,
ON BEHALF OF THE INDIANA DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT

Thomas W. Easterly
Commissioner
Indiana Department of Environmental Management

As to form and legality:

Gregory F. Zoeller
Indiana Attorney General

Patricia Orloff Erdmann
Chief Counsel for Litigation
Office of the Attorney General
Indiana Government Center South
5th Floor
302 West Washington Street
Indianapolis, Indiana  46204

–91–

**Signature Page for Consent Decree in:**

*United States of America*
*v.*
*Northern Indiana Public Service Co.*

**FOR NIPSCO:**

By: _____

Jimmy D. Staton
Executive Vice President and Group Chief Executive Officer,
Northern Indiana Energy Business Segment

Date: _____12/9/10_____

-- 92 --

# APPENDIX A

## APPENDIX A:  ENVIRONMENTAL MITIGATION PROJECTS

        In compliance with and in addition to the requirements in Section XI of this Consent Decree (Environmental Mitigation Projects), NIPSCO shall comply with the requirements of this Appendix to ensure that the benefits of the $9.5 million in federally directed Environmental Mitigation Projects (Projects) are achieved.

### I. Overall Environmental Projects Schedule

A.     Within the specified time delineated for each Project, as further described below, NIPSCO shall submit proposed Project plan(s) to EPA for review and approval pursuant to Section XIV of the Consent Decree (Review and Approval of Submittals) for expenditure of the Project Dollars specified in this Appendix in accordance with the deadlines established in this Appendix.  EPA shall determine, prior to approval, that all Projects are consistent with federal law.

B.     Beginning one hundred and twenty (120) days from the Date of Entry, and continuing annually thereafter until completion of each Project (including any applicable periods of demonstration or testing), NIPSCO shall provide EPA with written reports detailing the progress of each Project, including an accounting of Project Dollars spent to date.

C.     All proposed Project plans shall include the following:

1. A plan for implementing the Project;
2. A summary-level budget for the Project;
3. A time-line for implementation of the Project; and
4. A description of the anticipated environmental benefits of the Project, including an estimate of emission reductions (e.g., $SO_2$ , NOx, PM, CO2) expected to be realized.

D.     Upon approval by EPA of the plan(s) required by this Appendix, NIPSCO shall complete the approved Project(s) according to the approved plan(s). Nothing in this Consent Decree shall be interpreted to prohibit NIPSCO from completing the Project(s) ahead of schedule.

E.     In accordance with the requirements of Paragraph 114, within 60 days following the completion of each Project, NIPSCO shall submit to EPA for approval a report that documents:

1. The date the Project was completed;
2. The results of implementation of the Project, including the estimated emission reductions or other environmental benefits achieved; and
3. The Project Dollars incurred by NIPSCO in implementing the Project.

1

## II. Environmental Mitigation Projects

A. <u>Clean Diesel Retrofit Project</u>

1.     Within 120 day of the Date of Entry, NIPSCO shall propose to EPA for review and approval a plan, in consultation with IDEM, to retrofit in-service diesel engines with emission control equipment further described in this Section, designed to reduce emissions of particulates and/or ozone precursors (the "Clean Diesel Retrofit Project") and to fund the operation and maintenance of the retrofit equipment for the time-period described below.    The Project shall include, where necessary, techniques and infrastructure needed to support such retrofits. NIPSCO shall ensure, or direct any third party contractor or partner to ensure, that the recipients operate and maintain the retrofit equipment for five years from the date of installation by providing funding for operation and maintenance as described in Section II.A.2.g, below.

2.     In addition to the requirements of Section I. C. of this Appendix, the plan shall also satisfy the following criteria:

a.     Involve vehicles based in and equipment located in NIPSCO's service territory in northern Indiana, bordered by the cities of Gary-Hammond, Michigan City, South Bend-Elkhart, and Fort Wayne.

b.     Provide for the retrofit of public diesel engines with EPA or California Air Resources Board ("CARB") verified emissions control technologies to achieve the greatest reasonably possible mass reductions of particulates and/or ozone precursors for the fleet(s) that participate(s) in the Clean Diesel Retrofit Project. Depending upon the particular EPA or CARB verified emissions control technology selected, the retrofit diesel engines will be expected to achieve emission reductions of particulates and/or ozone precursors by 30%-90%.

c.     Describe the process NIPSCO will use to determine the most appropriate emissions control technology for each particular diesel engine that will achieve the greatest reasonably possible mass reduction of particulates and/or ozone precursors. In making this determination, NIPSCO must take into account the particular operating criteria required for the EPA or CARB verified emissions control technology to achieve the verified emissions reductions.

d.     Provide for the retrofit of diesel engines with either: (a) diesel particulate filters (DPF); (b) diesel oxidation catalysts (DOC); or (c) closed crankcase ventilation systems with either DPF or DOC.

e.     Describe the process NIPSCO will use to notify fleet operators and owners within the geographic area specified in Section II.A.2.a that their fleet of vehicles may be eligible to participate in the Clean Diesel Retrofit Project and to solicit their interest in participating in the Project.

2

f.      Describe the process and criteria NIPSCO will use to select the particular fleet operator and owner to participate in this Project, consistent with the requirements of this Section.

g.      For each of the recipient fleet owners and operators, describe the amount of Project Dollars that will cover the costs associated with: (a) purchasing the verified emissions control technology, (b) installation of the verified emissions control technology (including datalogging), (c) training costs associated with repair and maintenance of the verified emissions control technology (including technology cleaning and proper disposal of waste generated from cleaning), and (d) the incremental costs for repair and maintenance of the retrofit equipment (i.e., DPF, DOC, closed crankcase ventilation system) for five years from the date of installation, including the costs associated with the proper disposal of the waste generated from cleaning the verified emissions control technology. This Project shall not include costs for normal repair or operation of the retrofit diesel fleet. Include a mechanism to ensure that recipients of the retrofit equipment will bind themselves to follow the operating criteria required for the verified emissions control technology to achieve the verified emissions reductions and properly maintain the retrofit equipment installed in connection with the Project for the period beginning on the date the installation is complete through December 31, 2015.

h.      Describe the process NIPSCO will use for determining which diesel engines in a particular fleet will be retrofitted with the verified emissions control technology, consistent with the criteria specified in Section II.A.2.b.

i.      Ensure that recipient fleet owners and/or operators, or their funders, do not otherwise have a legal obligation to reduce emissions through the retrofit of diesel engines.

j.      For any third party with whom NIPSCO might contract to carry out this Project, establish minimum standards that include prior experience in arranging retrofits, and a record of prior ability to interest and organize fleets, school districts, and community groups to join a clean diesel program.

k.      Direct the recipient fleet(s) to comply with local, state, and federal requirements for the disposal of the waste generated from the verified emissions control technology and follow CARB's guidance for the proper disposal of such waste, provided however, that NIPSCO shall not be a guarantor of or responsible for the actions or omissions of the recipients.

l.      Include a schedule and budget for completing each portion of the Project, including funding for operation and maintenance of the retrofit equipment through December 31, 2015.

3.    In addition to the information required to be included in the report pursuant to Section I.C, NIPSCO shall also describe the fleet owner/operator; where it implemented this Project; the particular types of verified emissions control technology (and the number of each type) that it installed pursuant to this Project; the type, year, and horsepower of each vehicle; an estimate of the number of citizens affected (if applicable) by this Project, and the basis for this estimate; and an estimate of the emission reductions for Project or engine, as appropriate (using the manufacturer's estimated reductions for the particular verified emissions control technology), including particulates, hydrocarbons, carbon monoxide, and nitrogen oxides.

B.    Wood Stove and Wood Outdoor Boiler Changeout Project

1.    Within 120 days of the Date of Entry, NIPSCO shall propose a plan to sponsor a Wood-burning Changeout and Retrofit Project ("Wood Stove/Boiler Changeout and Retrofit Project") that a state or local government agency ("air pollution control agency") or third-party non-profit will agree to implement in an area that would benefit from reductions of fine particle pollution and/or hazardous air pollutants by replacing, or retrofitting or upgrading inefficient, higher polluting wood-burning stoves and outdoor boilers with Energy Star qualified Heat Pumps, EPA Phase 2 hydronic heaters, natural gas boilers of 90% or higher AFUE, natural gas furnaces of 92% or higher AFUE or EPA-certified wood-stoves and/or cleaner burning, more energy-efficient hearth appliances (e.g., wood pellet, gas, or propane stove).

2.    Any Wood Stove/Boiler Changeout and Retrofit Project that NIPSCO sponsors shall provide educational information (including, energy efficiency, health and safety benefits, and outreach regarding cleaner-burning alternatives and proper operation of the new technology) and incentives through rebates, discounts, or in some instances, actual replacement of the old technology wood-burning stoves or boilers for income-qualified residential homeowners, to encourage residential homeowners to replace their old, higher polluting and less energy efficient wood stoves or outdoor boilers.

3.    NIPSCO shall sponsor the implementation of any Wood Stove/Boiler Changeout and Retrofit Project in NIPSCO's service area(s) in northern Indiana, bordered by the cities of Gary-Hammond, Michigan City, South Bend-Elkhart, and Fort Wayne that promise significant environmental benefit from the Wood Stove/Boiler Changeout and Retrofit Project. The Wood Stove/Boiler Changeout and Retrofit Project shall also include the counties of LaPorte, Lake, and Porter. In determining the specific areas to implement this Project within the aforementioned geographic area, NIPSCO shall give priority to areas with high amounts of air pollution, especially particle pollution and/or hazardous air pollutants, areas located within a geography and topography that makes it susceptible to high levels of particle pollution, or areas that have a significant number of old and/or higher polluting wood-burning stoves or outdoor boilers.

4.    The air pollution control agency(ies) and/or non-profit(s) that NIPSCO selects shall consult with EPA's wood smoke team and implement any Wood Stove/Boiler Changeout and Retrofit Project consistent with the materials available on EPA's Burn

4

Wise website at http://www.epa.gov/burnwise.

5.      In addition to the requirements of Section I.C , any plan to implement this Project shall also satisfy the following criteria:

   a.      Identify the air pollution control agency(ies) and/or non-profit(s) selected to implement the Wood Stove/Boiler Changeout and Retrofit Project.

   b.      Describe the schedule and budgetary increments in which NIPSCO shall provide the necessary funding to the air pollution control agency(ies) and/or non-profits(s) to implement any  Wood Stove/Boiler Changeout and Retrofit Project.

   c.      Ensure that the air pollution control agency(ies) and/or non-profit(s) will implement any  Wood Stove/Boiler Changeout and Retrofit Project in accordance with the requirements of this Appendix, and that the Project Dollars will be used to support the actual replacement, upgrade or retrofit of stoves/boilers currently used as the primary or secondary source of residential heat with a cleaner, more energy efficient stove/boiler (i.e., geothermal heat pump, wood pellet stove, EPA-certified wood stove, gas stove, EPA Phase 2 qualified hydronic heater, natural gas boiler of 90% or higher AFUE, natural gas furnace of 92% or higher AFUE or propane stove). To enable the project to carry on in the future, funds may be used to support changeout/upgrades through revolving loan programs or other low-interest loan programs. NIPSCO shall limit the use of Project Dollars for administrative costs associated with implementation of the program to no greater than 10% of the Project Dollars NIPSCO provides to a specific air pollution control agency and/or non-profit. Up to 7% can be used for personnel cost and the remaining 3 % for other (e.g., outreach materials, training, studies/surveys, travel) project support costs.

   d.      Describe all of the elements of any Wood Stove/Boiler Changeout and Retrofit Project that the air pollution control agency(ies) and/or nonprofit(s) will implement. NIPSCO shall describe and estimate the number of energy efficient appliances it intends to make available, the cost per unit, and the criteria the air pollution control agency(ies) and/or nonprofit(s) will use to determine which residential homeowners should be eligible for actual stove replacement.

   e.      If applicable, identify any organizations with which the air pollution control agency(ies) and/or non-profit(s) will partner to implement the Project, including such organizations as: the Hearth, Patio, and Barbecue Association of America, the Chimney Safety Institute of America, a local chapter of the American Lung Association, individual stove retailers, propane dealers, facilities that will dispose of old stoves so that they cannot be resold or reused, housing assistance agencies, local fire departments, local health organizations, and local green energy organizations.

       f.      Describe how the air pollution control agency(ies) and/or non-profit(s) will ensure that the old and/or higher polluting wood-burningstove/boiler will be properly recycled or disposed.

C.    <u>Land Acquisition and Restoration Project in Northwest Indiana</u>

1.    Within 45 days from the Date of Entry, NIPSCO shall establish a stakeholder process to solicit input into the funding of land acquisition or restoration Project(s) of lands adjacent to, or near, the Indiana Dunes National Lakeshore, and may include other lands in the northwest Indiana area, potentially affected by emissions form one or more of the NIPSCO Units.   The stakeholder process will consist of a maximum of five members and, at minimum, shall include a representative from The Indiana Dunes National Lakeshore, a representative from Indiana Department of Natural Resources, and a representative from an environmental organization such as the Nature Conservancy.

2.    The goal of this Project will be the protection through acquisition and/or restoration of ecologically significant land, watersheds, vegetation, and forests within northwest Indiana using adaptive management techniques designed to improve ecosystem health and mitigate harmful effects from air pollution. For purposes of this Appendix and Section XI of this Consent Decree (Environmental Mitigation Projects), land acquisition means purchase or transfer of interests in land, including fee ownership, easements, or other restrictions that run with the land that provide for perpetual protection of the acquired land.  The transfer of property or land interests by NIPSCO to any governmental or nongovernmental organization shall be credited at fair market value and must provide for perpetual protection of the land.  Restoration may include, by way of illustration, direct reforestation (particularly of tree species that may be affected by acidic deposition) and soil enhancement. Any restoration action must also incorporate the acquisition of an interest in the restored lands sufficient to ensure perpetual protection of the restored land, unless the land restored is already under the ownership of a governmental entity that has a legal duty to conserve the land in perpetuity. Any proposal for acquisition of land must identify fully all owners of the interests in the land. Every proposal for acquisition or transfer of land must identify the ultimate holder of the interests to be acquired and provide a basis for concluding that the proposed holder of title is appropriate for long-term protection of the ecological and/or environmental benefits sought to be achieved through the acquisition.

3.    The Project(s) will focus on lands adjacent to, or near, the Indiana Dunes National Lakeshore, and may include other lands in the northwest Indiana area, potentially affected by emissions from one or more of the NIPSCO Units.  Examples of Projects include:

       a.      Acquire and Restore Disturbed Land at NIPSCO Michigan City Plant and Crescent Dune Area:  Funding this Project would provide for acquisition, cleanup, invasive species control, and restoration of approximately 246 acres at and around the NIPSCO Michigan City site; and

    b.    Acquire, Restore, and Donate Land Adjacent to Indiana Dunes National Lakeshore:  Funding for this Project would provide for acquisition and restoration of lands adjacent to the National Lakeshore and would include the transfer of title to such lands, or the granting of an easement over such lands, to the National Park Service.

    4.    Within one year of Date of Entry of this Consent Decree, through the stakeholder process described in II.C.1 above, NIPSCO will identify and provide recommendations for specific Projects to EPA for approval.

D.    <u>Funding Obligations for Section II Environmental Projects</u>

    1.    Within three years of the Date of Entry of this Consent Decree, NIPSCO will have completed the expenditure of a minimum of $3,500,000 to fund and implement the approved Clean Diesel and Wood Stove Changeout Projects as described in II.A and II.B. NIPSCO shall retain the discretion to determine how best to allocate the minimum $3,500,000 in Project Dollars between the approved Clean Diesel and Wood Stove Changeout Projects.

    2.    Within three years of the Date of Entry of this Consent Decree, NIPSCO will have completed the expenditure of a minimum of $1,500,000 and a maximum of $2,000,000 to fund and implement the approved Land Acquisition and Restoration Project as described in II.C.

## III. Additional Environmental Mitigation Projects

A.    Within 1 year of the Date of Entry, as further described below, NIPSCO shall submit proposed Project plan(s) to EPA for review and approval pursuant to Section XIV of the Consent Decree (Review and Approval of Submittals) for expenditure of the remaining Project Dollars over a period of not more than five years from the Date of Entry, except as provided below. NIPSCO shall not spend more than $2 million of the remaining Project Dollars on a single project in this Section III "Additional Environmental Mitigation Projects." The Parties agree, subject to the requirements of this Appendix, that NIPSCO may in its discretion decide which of the Projects specified in Sections III.C, and D, of this Appendix to propose for EPA approval. NIPSCO may, at its election, consolidate the plans required by this Appendix into a single plan. In addition, NIPSCO may propose during the five year period to make amendments or modifications to the plan or plans for EPA review and approval.  NIPSCO has no current obligation to undertake any of the Projects described below in Sections III.C, D, and E.

B.    The Parties agree that NIPSCO is entitled to spread its payments for Projects over the five-year period commencing upon the Date of Entry. NIPSCO is not, however, precluded from accelerating payments to better effectuate a proposed mitigation plan, provided that NIPSCO shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures. EPA shall determine prior to approval that all Projects are consistent with federal law.

C.    Hybrid Fleet Project

1.    NIPSCO may elect to submit a plan for a hybrid and/or electric fleet project to reduce emissions from NIPSCO's fleet of motor vehicles. NIPSCO has a substantial fleet of motor vehicles where it operates. These motor vehicles are generally powered by conventional diesel or gasoline engines and include vehicles such as diesel "bucket" trucks. The use of hybrid engine technologies in NIPSCO's motor vehicles, such as diesel-electric engines, will improve fuel efficiency and reduce emissions of NOx, PM, VOCs, and other air pollutants.

2.    As part of any plan for the Hybrid Fleet Project, assuming that NIPSCO elects to undertake this Project, NIPSCO may elect to spend Project Dollars on the replacement of conventional motor vehicles in its fleet with newly manufactured hybrid and/or electric vehicles.

3.    In addition to the requirements of Section I.C of this Appendix, any plan for the Hybrid Fleet Project shall:

   a.    Propose the replacement of convention diesel engines in bucket trucks or other mobile sources with hybrid or electric engines, and/or propose the replacement of portions of NIPSCO's fleet (including cars, vans, and pickup trucks) with hybrid and/or electric vehicles. For purposes of this subsection of this Appendix, "hybrid and/or electric vehicle" means a vehicle that can generate and/or utilize electric power to reduce the vehicles consumption of diesel or gasoline fuel. Any such vehicle proposed for inclusion in the Hybrid Fleet Project shall meet all applicable engine standards, certifications, and/or verifications.

   b.    Propose a method to account for the amount of Project Dollars that will be credited for each replacement made under subparagraph (a) above, taking into account the incremental cost of such engines or vehicles as compared to conventional engines or vehicles and potential savings associated with the replacement;

   c.    Prioritize the replacement of diesel-powered vehicles in NIPSCO's fleet. Certify that NIPSCO will use the Hybrid Vehicles for their useful life (as defined in the proposed Plan).

4.    Notwithstanding any other provision of this Consent Decree, including this Appendix, NIPSCO shall only receive credit toward Project Dollars for the incremental cost of hybrid and/or electric vehicles as compared to the cost of a newly manufactured, similar motor vehicle powered by conventional diesel or gasoline engines.

D.    Electric Vehicle Infrastructure Enhancement

1.    NIPSCO may undertake enhancements to the electric vehicle charging infrastructure by funding creation of one or more charging stations for electric vehicles in the Northwest Indiana area bordered by the cities of Gary-Hammond, Michigan City, South Bend-Elkhart, and Fort Wayne.  Battery powered and some hybrid vehicles need plug-in infrastructure to recharge the batteries.  Establishment of electric vehicle charging stations in Northwest Indiana could expand the useful driving range of electric vehicles in the Chicago metropolitan area as well as encourage Northwest Indiana drivers to purchase electric vehicles for local use as well as commutes to Chicago.  Locations for such charging stations would be targeted for areas where vehicles could be left for several hours to fully charge the electric vehicle's battery system.

2.    If NIPSCO elects to undertake this Project, it may partner with third party organizations (e.g., NIRPC, SSCC) to handle funding and selection of locations in Northwest Indiana.  Locations would be sought to maximize the number of vehicles that could utilize the chargers while striving to expand into Northwest Indiana the network of electric vehicle charging stations currently in the Illinois portion of the greater Chicago metropolitan area.  Potential sites could consist of locations that provide public access, including  parking lots at mass transit terminals/stops (such as South Shore Commuter Rail stations, RDA bus stops), large industrial facilities or similar employers (NIPSCO, Methodist Hospital, steel mills), residences, and and shopping malls in Lake and Porter counties.

3.    Emission reductions - overall emissions reductions would depend upon the number of vehicles utilizing the facilities and would be based upon the type of vehicle the electric vehicle replaces in the general geographic area, the emissions characteristics and the annual vehicle miles traveled (VMT).  For the term of this project NIPSCO would commit to effectively supply the vehicle charging station with zero emission renewable energy sources through the use of renewable energy credits (RECs).  Therefore the usage would be considered emission free.  NIPSCO will report the expected and achieved environmental benefits.

4.    NIPSCO may consider and implement additional options to enhance electric vehicle usage, such as to:

   a.    Provide a purchase incentive for acquisition of plug-in hybrid electric vehicle (PHEV), pure battery electric vehicle (EV), or lesser incentive to a conventional vehicle converted to a plug-in

   b.    Fund low-interest loans through banks and dealers for plug-in vehicles

   c.    Provide direct cash incentives to consumers for vehicle purchase.

E. Residential and Commercial Electric to Natural Gas Conversion Project

      1.      NIPSCO may submit a plan to EPA to implement a Residential and Commercial Electric to Natural Gas Conversion Project ("Conversion Project") to reduce life cycle $SO_2$, NOx, and PM and other air emissions resulting from residential and commercial space and water heating energy usage. If NIPSCO elects to perform this Conversion Project, the Conversion Project will consist of specific measures that will produce long-term, permanent, environmental benefits by the removal and replacement of electric resistance furnaces and water heaters with new high efficiency natural gas furnaces (92% or higher AFUE) and natural gas water heaters. The reduction in emissions of $SO_2$, NOx, PM, and other air emissions would occur based on the more efficient energy delivery by natural gas compared to electricity (approximately 92% delivery efficiency for natural gas versus 32% delivery efficiency for electricity) and the use of inherently cleaner burning natural gas compared to the overall predominance of coal based fuels in this subregion. The Conversion Project will be performed in and demonstrate $SO_2$, NOx, PM and other air emission benefits to communities in northern Indiana, bordered by the cities of Gary-Hammond, Michigan City, South Bend-Elkhart, and Fort Wayne area and provide benefits beyond what is required of NIPSCO under any Indiana Utility Regulatory Commission state-wide mandate.

      2.      If NIPSCO elects to undertake this Conversion Project, it may partner with third party organizations to handle funding and selection of residences and commercial establishments for the removal of electric resistance furnaces and water heaters and replacement with natural gas-fired units.